2013-1490

## In the
## United States Court of Appeals
## For the Federal Circuit

ASTRAZENECA AB, AKTIEBOLAGET HÄSSLE,
ASTRAZENECA LP, KBI INC., and KBI-E INC.,

*Plaintiffs-Appellants,*

v.

HANMI USA, INC., HANMI PHARMACEUTICAL CO., LTD., HANMI
FINE CHEMICAL CO., LTD., and HANMI HOLDINGS CO., LTD.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the District of New Jersey in case no. 11-cv-0760,
Judge Joel A. Pisano

**BRIEF OF PLAINTIFFS-APPELLANTS ASTRAZENECA AB,
AKTIEBOLAGET HÄSSLE, ASTRAZENECA LP, KBI INC., and KBI-E INC.**

Henry J. Renk
Bruce C. Haas
Joshua I. Rothman
FITZPATRICK, CELLA, HARPER
  & SCINTO
1290 Avenue of the Americas
New York, New York  10104-3800
(212) 218-2100

Jay I. Alexander
Einar Stole
Eric R. Sonnenschein
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004-2401
(202) 662-6000

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTEREST

Counsel for the Appellants AstraZeneca AB, Aktiebolaget Hässle, AstraZeneca LP, KBI Inc., and KBI-E Inc., certifies the following:

1. The full name of every party or amicus represented by me is:

AstraZeneca AB, Aktiebolaget Hässle, AstraZeneca LP, KBI Inc., KBI-E Inc.

2. The name of the real party in interest is:

AstraZeneca AB, Aktiebolaget Hässle, AstraZeneca LP, KBI Inc., KBI-E Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

For AstraZeneca AB, Aktiebolaget Hässle and AstraZeneca LP: AstraZeneca PLC, a publicly-held company, is the ultimate parent company.  No other publicly-held corporation owns 10% or more of the stock of AstraZeneca AB, Aktiebolaget Hässle and AstraZeneca LP.

For KBI Inc. and KBI-E Inc.:  Merck & Co. Inc., a publicly-held company, is the ultimate parent company.  Merck, Sharp & Dohme Corp. is also a parent company of KBI Inc. and KBI-E Inc.  No other publicly-held corporation owns 10% or more of the stock of KBI Inc. or KBI-E Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Henry J. Renk
Bruce C. Haas
Colleen Tracy
Joshua I. Rothman
Michael E. Furrow
Colleen Tracy
Anna Huang
James Tyminski
Patrick L. Chen
Lauren B. Zuffante
FITZPATRICK, CELLA, HARPER
  & SCINTO
1290 Avenue of the Americas
New York, New York  10104-3800

John E. Flaherty
Jonathan M.H. Short
Thomas A. Stevens
Carissa L. Rodriguez
Elina Slavin
Mark H. Anania
Symone J. Redwine
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102

Errol B. Taylor
Frederick M. Zullow
Emily J. Kunz
Anna Brook
Dana Roitberg Weir
Renee H. Sekino
MILBANK, TWEED, HADLEY
  & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005

Jay I. Alexander
Einar Stole
Eric R. Sonnenschein
Jessica L. Parezo
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004-2401

Dated:  September 3, 2013

Respectfully submitted,

__/s/ Jay I. Alexander__

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUE PRESENTED.........................................2

STATEMENT OF THE CASE .................................................................3

STATEMENT OF FACTS ........................................................................9

A.  The Chemistry. ..............................................................................9

B.  The '504 and '192 Patent Specifications.......................................12

    1.  The '504 Patent. ...................................................................12

    2.  The '192 Patent. ...................................................................15

C.  The Patent Prosecution..................................................................17

SUMMARY OF ARGUMENT .................................................................20

STANDARD OF REVIEW......................................................................24

ARGUMENT ...........................................................................................24

A.  The District Court's Constructions Contravene the
Undisputed Ordinary and Customary Meaning of "Alkaline
Salt" and "Pharmaceutically Acceptable Salt."...............................24

B.  The Intrinsic Record Does Not Justify Departure From the
Ordinary and Customary Meaning Here. .......................................25

    1.  The Patent Specifications Do Not Clearly or Uniformly
Limit the Claims to Only the Six Exemplary Salt
Species. ..................................................................................26

    2.  The Prosecution History Confirms The Patentees'
Intent to Claim the "Alkaline Salts" Genus..........................35

3.     Nothing in the Intrinsic Record Overcomes the
       Presumption That the Dependent Claims Narrow the
       Independent Claims. ............................................................ 38

CONCLUSION ......................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011) ...................................................... 31, 34

*Aventis Pharm. Inc. v. Amino Chems. Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013) ............................................................ 24

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) .............................................................. 30

*Cybor Corp. v. FAS Techs, Inc.*,
138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) ........................................... 24

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ............................................................ 34

*Interdigital Commc'ns, LLC v. ITC*,
690 F.3d 1318 (Fed. Cir. 2012) ...................................................... 39, 40

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999) ......................................... 32, 33, 34, 43

*Laitram Corp. v. Rexnord, Inc.*,
939 F.2d 1533 (Fed. Cir. 1991) .................................................. 7, 41, 42

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .............................................................. 39

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (*en banc*),
*aff'd*, 517 U.S. 370 (1996) ............................................................... 1, 24

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ............................................................ 27

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................................ 24

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) ...................................................... 31, 34

*Rambus Inc. v. Infineon Techs. AG*,
    318 F.3d 1081 (Fed. Cir. 2003) ................................................ 31, 32, 34

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) ............................................................. 29

*SanDisk Corp. v. Kingston Tech. Co.*,
    695 F.3d 1348 (Fed. Cir. 2012) ............................................................ 39

*Seachange Int'l, Inc. v. C-COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) .................................................. 7, 41, 42

*SunRace Roots Enter. Co. v. SRAM Corp.*,
    336 F.3d 1298 (Fed. Cir. 2003) ...................................................... 38, 39

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ............................................................ 27

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ...................................................... 26, 27

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008) ...................................................... 31, 34

*Woods* v. *DeAngelo Marine Exhaust, Inc.*,
    692 F.3d 1272 (Fed. Cir. 2012) ............................................................ 26

## Statutes

28 U.S.C. §1295(a)(1) ..................................................................................... 1

28 U.S.C. §§1331 ........................................................................................... 1

28 U.S.C. §§1338 ........................................................................................... 1

35 U.S.C. §112 ..................................................................................... passim

35 U.S.C. §271 ........................................................................... 1

## STATEMENT OF RELATED CASES

There have been no other appeals in or from this action previously before this or any other appellate court.

No other cases are known to counsel that are pending in district court and will be directly affected by this Court's decision in the pending appeal.

# STATEMENT OF JURISDICTION

This appeal is taken from a June 3, 2013 Consent Order and Final Judgment (A1-4), including the district court's antecedent December 10, 2012 *Markman* opinion and order.  (A5-20)

The district court had jurisdiction over the underlying case pursuant to*, inter alia*, 28 U.S.C. §§1331, 1338 and 35 U.S.C. §271. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a)(1) because the Consent Order and Final Judgment appealed from is a final judgment in a civil action for patent infringement.

Notice of appeal was timely filed on July 1, 2013.  (A13471-73)

## STATEMENT OF THE ISSUE PRESENTED

Whether the district court erred in construing the terms "alkaline salt" of esomeprazole and "pharmaceutically acceptable salt" of esomeprazole in the independent claims of the respective patents-in-suit as limited to the six exemplary salt species disclosed in the earlier of the two patents where:

(a) the court's construction contravenes the ordinary and customary meaning of the claim terms at issue;

(b) the specifications of the patents-in-suit describe the "invention" in broad terms and contain no special definition or clear and unambiguous disavowal to justify overriding the ordinary and customary meaning or otherwise limiting the claims to the exemplary embodiments;

(c) the specification and prosecution history of the earlier patent reveal that the applicants and the examiner understood "alkaline salt" to be broader than the six exemplary salts; and

(d) the court's construction effectively nullifies dependent claims that specifically recite the six exemplary salts as further limitations of the broader terms used in the independent claims.

## STATEMENT OF THE CASE

Independent claims of AstraZeneca's '504 patent[1] recite a "pharmaceutical formulation" comprising "a pure solid state alkaline salt" of the (–)-enantiomer of omeprazole. (A33 at 14:7) That enantiomer is known as "esomeprazole." The ordinary and customary meaning of an "alkaline salt" in this context was undisputed. AstraZeneca's expert explained—without contradiction—that a "salt" is "made up of positively charged ions (cations) and negatively charged ions (anions) held together in the solid state by ionic bonds" and that an "alkaline salt" is a salt "that generates basic solutions in water or that is generated under basic conditions." (A5343-5364 at A5353-54, ¶¶35-36)

Dependent claims more narrowly specify that "the alkaline salt is a $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt."[2] (A33 at 14:13-15, 48-49) The

---

[1] Appellants are AstraZeneca AB, Aktiebolaget Hässle, AstraZeneca LP, KBI Inc. and KBI-E Inc (collectively referred to as "AstraZeneca"). The patents involved in this appeal are U.S. Patent No. 5,714,504 (A25-33) and U.S. Patent No. 5,877,192 (A34-46), which is a continuation-in-part of the '504 patent.

[2] The six cations set out in the dependent claims include three "monovalent" (*i.e.*, singly-charged) alkali metals of Group IA of the Periodic Table of Elements, sodium ($Na^+$), lithium ($Li^+$) and potassium ($K^+$); two "divalent" (*i.e.*, double-charged) alkaline earth metals of Group (continued…)

claims thus follow the classic format in which an independent claim recites the invention more broadly and dependent claims define certain limitations more narrowly. *See* 35 U.S.C. §112(d) ("a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed").

Despite this familiar pattern, the district court construed "alkaline salt" in the independent claims as limited only to $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts, effectively nullifying the dependent claims. (A10-13)  The district court also construed the term "pharmaceutically acceptable salt" in the '192 patent as similarly limited to these six exemplary salts, which are disclosed in the '504 patent specification, but not mentioned in the '192 patent.  (A16-18)  These errors are central to this appeal.

AstraZeneca sells Nexium®, the active ingredient of which is an alkaline magnesium ($Mg^{2+}$) salt of esomeprazole.  Hanmi[3] seeks approval to market a product containing an alkaline strontium ($Sr^{2+}$)

---

IIA, magnesium ($Mg^{2+}$) and calcium ($Ca^{2+}$); and an organic "ammonium" group, $N^+(R)_4$.

[3] Appellees are Hanmi, Inc., Hanmi Pharmaceutical Co., Ltd., Hanmi Fine Chemical Co., Ltd. and Hanmi Holdings Col. Ltd. (collectively referred to as "Hanmi").

salt of esomeprazole. Strontium and magnesium both form divalent

cations in the same Group IIA of the Periodic Table:



(Adapted from A7516)

Hanmi filed its New Drug Application seeking approval to market

its strontium salt in December 2010. (A7)[4] Hanmi's submission

included a Paragraph IV certification asserting that the '504 and '192

patents are invalid or would not be infringed by Hanmi's proposed

product. (*Id.*) AstraZeneca filed suit in February 2011 in the United

States District Court for the District of New Jersey, alleging that

---

[4] Hanmi received final marketing approval from the FDA on August 6, 2013, after the appellate record was closed.

Hanmi's proposed product infringes the claims of the patents-in-suit. (A1515)

Following a claim construction hearing, the district court issued an Opinion construing, *inter alia*, the terms "alkaline salt" in the '504 patent and "pharmaceutically acceptable salt" in the '192 patent. (A10-13, A16-18) AstraZeneca argued that both of these terms should be given the same meaning: "a basic salt [of esomeprazole] that is suitable for use in a pharmaceutical formulation." (A5258-62, A5267-70) Hanmi insisted that these claim terms be limited only to the "$Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts" specifically disclosed in the '504 patent specification. (A5080-86)

The district court adopted Hanmi's construction. The court concluded that the '504 patent specification had expressly defined the "invention" as limited to the six salts listed above. (A11) The court relied on two portions of the patent specification: (i) the abstract, which identifies "The novel optically pure compounds $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$ salts of [esomeprazole]" and (ii) a sentence from the Detailed Description of the Invention which states: "The present invention refers to the new $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts of the single

- 6 -

enantiomers of omeprazole, …" (A11)  The court either rejected or failed to address other parts of the specification—which will be addressed in detail below—that describe the six enumerated salts simply as examples or preferred embodiments of the invention.  (A12)  Most importantly, the court also failed to appreciate the '504 patent prosecution history, which shows that the claim term "alkaline salt" was intended to have a meaning broader than the six disclosed, and separately claimed, salt species. (*See generally* A10-13)  This prosecution history cannot be reconciled with a construction of "alkaline salt" being limited to the six salt species.

The district court acknowledged that the six exemplary salts were called out specifically in the dependent claims of the '504 patent, and that the independent claims contained broader language.  However, the court took the view that "the doctrine of claim differentiation is 'not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history'" and that "[c]laim differentiation is a guide, not a rigid rule" (quoting *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) and *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.  Cir. 1991)).

On this rationale, the court stated that it "[i]n light of the relevant intrinsic evidence," it was "not persuaded by AstraZeneca's claim differentiation argument." (A12)

The district court further held that the term "pharmaceutically acceptable salt" used in the claims of the '192 patent has the same meaning as "alkaline salt" in the '504 patent because the disclosure of the '192 patent incorporates by reference the disclosure of salts from the '504 patent. (A16-18) According to the district court, because of this incorporation by reference, one skilled in the art would understand the '192 patent "to be focused on the alkaline salts of esomeprazole" and thus the claims of the '192 patent should be limited to the six salts expressly described in the '504 patent. (A16-18) AstraZeneca agrees that "pharmaceutically acceptable salts" should have the same meaning as "alkaline salt," just not the meaning the district court adopted.

The district court subsequently denied AstraZeneca's motion for reconsideration, ruling that it had adequately considered and addressed the legal principles involved in the case in its original opinion. (A21-24)

The parties subsequently consented to entry of a final judgment that under the court's claim construction, the Hanmi product does not

infringe.  (A1-4)  Hanmi also stipulated, without conditions, that the '504 and '192 patents are "enforceable and valid in this and in any other future cause of action, litigation or proceeding."  (A2)  This appeal follows.

## STATEMENT OF FACTS

### A.    The Chemistry.

Omeprazole is a pharmaceutical compound used to treat gastro-esophageal reflux disease and other conditions caused by excess stomach acid by decreasing the amount of acid produced in the stomach.  (A27 at 1:17-26)  Omeprazole had varied results among patients, and so scientists at AstraZeneca sought to develop a more effective drug with less inter-individual variation.  (*Id.* at 1:50-55)

Omeprazole is a "racemate," which means that it is a mixture of two compounds called "enantiomers."  Enantiomers are molecules that are mirror images of each other, much like one's hands are mirror images of the other.  The two enantiomers comprising omeprazole are illustrated below:

# OMEPRAZOLE



(–) or (S) omeprazole        mirror plane        (+) or (R) omeprazole

(A5348-52 at ¶¶17-30)

As the graphic illustrates, the enantiomer on the left is "(S) omeprazole," which is also denoted as "(–)-omeprazole." When used as an active ingredient in a pharmaceutical product, (–)-omeprazole is known by the non-proprietary name "esomeprazole." AstraZeneca's inventors discovered that alkaline salts of the esomeprazole enantiomer are more uniformly effective among a larger percentage of the patient population than salts of racemic omeprazole. (A39 at 2:13-36; A3245-58)

AstraZeneca's expert, Dr. Stephen Davies, established that the term "salt" has a well understood ordinary meaning—a chemical compound made up of two types of ions: "cations" (*i.e.*, positively charged ions) and "anions" (*i.e.*, negatively charged ions). (A5353-54 at ¶35) An "alkaline salt" is a salt that is basic; that is, one that generates

basic solutions in water or is generated under basic conditions. This is in contrast to an acidic salt, which generates acidic solutions in water or is formed under acidic conditions. (A5354 at ¶36) Hanmi's expert, Dr. Jerry Atwood, agreed that an "alkaline salt" is a "basic salt" which "when dissolved in water, produces an alkaline pH or basic pH." (A7350 at 72-73)

The term "alkaline" derives from the monovalent alkali metals in Group IA and the divalent alkaline earth metals in Group IIA in the periodic table. Both react with water to provide basic solutions. (A5354 at ¶36 & n.1) Ammonia when dissolved in water also affords a basic solution, which is why salts of ammonium ($N^+(R)_4$) are often called "honorary" alkaline salts. (A5353-54 at ¶35) When esomeprazole forms a basic salt with one of the alkali metals or alkaline earth metals, or ammonium, a proton is removed from the neutral esomeprazole molecule, forming negatively charged esomeprazole, which can then bond with the positively charged cation of the alkali metal, alkaline earth metal or ammonium. (A5354-56 at ¶¶37-42)

**B.    The '504 and '192 Patent Specifications.**

The '504 patent issued on February 3, 1998 in the names of

inventors Per Lindberg and Sverker von Unge, both AstraZeneca

scientists.  (A26)  The '192 patent issued on March 2, 1999 from a

continuation-in-part of the '504 patent application and names Per

Lindberg and another AstraZeneca scientist, Lars Weidolf, as inventors.

(A35)  A terminal disclaimer makes both patents expire at the same

time.  (*Id.*)

**1.    The '504 Patent.**

The '504 patent specification states, under the heading "Field of

the Invention," that:  "*The present invention* is directed to new

compounds of high optical purity and crystalline salts thereof, their use

in medicine, a process for their preparation and their use in the

manufacture of pharmaceutical preparation."  (A27 at 1:8-12 (emphasis

added))  The "Summary of the Invention" explains the desire to "obtain

compounds with improved pharmacokinetic and metabolic properties

which will give an improved therapeutic profile such as a lower degree

of interindividual variation" and that:  "*The present invention* provides

such compounds, which are novel salts of single enantiomers of

omeprazole." (A27 at 1:50-55 (emphasis added))  The specification

continues:

> A preferred embodiment of *the present invention* provides pure crystalline enantiomeric salts of omeprazole and methods for the preparation thereof.
> A more preferred embodiment of *the present invention* is directed to an optically pure crystalline enantiomeric magnesium salt of omeprazole and method for the preparation thereof.

(A27 at 1:56-63 (emphasis added))

The "Detailed Description of the Invention" continues:  "*The*

*present invention* refers to the new $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$

salts of the single enantiomers of omeprazole, …" (A27 at 2:42-44) and

identifies the "[p]articularly preferred salts according to the invention"

as the $Na^+$, $Ca^{2+}$ and $Mg^{2+}$ salts and the "[m]ost preferred salts

according to the invention" as the "optically pure $Na^+$ salts of

omeprazole" and "the optically pure magnesium salts of omeprazole."

The sodium and magnesium salts are illustrated by chemical structures

given in the patent.  (A27-28 at 2:50-3:30 (emphasis added))

After summarizing how the sodium and magnesium salts are

obtained, as well as the calcium salt (A28-29 at 4:51-5:6), the

specification includes the following summary:

> Alkaline salts of the single enantiomers *of the invention* are,
> as mentioned above, beside the sodium salts (compounds Ia
> and Ib) and the magnesium salts (compounds IIa and IIb),
> *exemplified by* their salts with $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$,
> where R is an alkyl with 1-4 C-atoms.

(A29 at 5:7-11 (emphasis added))  Later, the specification introduces the

specific methods of preparing sodium and magnesium salts as

"examples" of "the invention":

> *The invention is illustrated by the following examples* using
> preferred procedures for the preparation of optically pure
> sodium salts and magnesium salts.

(A29 at 6:26-28 (emphasis added))

The '504 patent contains ten claims, which cover pharmaceutical

formulations and methods of treatment.  Claim 1 is the only

independent pharmaceutical formulation claim:

> 1.  A pharmaceutical formulation for oral administration
> comprising a pure solid state alkaline salt of [esomeprazole]
> and a pharmaceutically acceptable carrier.

(A33 at 14:6-10)

Claim 3 depends from claim 1, and narrows the scope of claim 1 to

six specific "alkaline salts":

> 3.  The pharmaceutical formulation according to claim 1,
> wherein the alkaline salt is a $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or
> $N^+(R)_4$ salt.

(A33 at 14:13-15)

Independent claims 6 and 7 are directed to a "method of inhibiting gastric acid secretion" and a "method for the treatment of gastrointestinal inflammatory disease," respectively, each comprising the step of the oral administration of "a pure solid state alkaline salt of [esomeprazole] and a pharmaceutically acceptable carrier." (A33 at 14:21-34) Dependent claim 10 recites:

> The method of claims 6 or 7[,] wherein the alkaline salt is a $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt.

(A33 at 14:48-49)

### 2. The '192 Patent.

The '192 patent explains, in the "Field of the Invention," that: "*The present invention* is related to the use of one of the single enantiomers of omeprazole, i.e.[,] the (–)-enantiomer of [omeprazole] or a pharmaceutically acceptable salt thereof, in the treatment of gastric acid related diseases." (A39 at 1:15-21 (emphasis added)) The patent specification explains, in the "Detailed Description of the Invention," that the mechanism of action of omeprazole operates through the CYP2C19 enzyme and that "it has also been found, according to *the present invention*, that administration of the (–)-enantiomer of

- 15 -

omeprazole or an acceptable therapeutical salt thereof results in a less

pronounced difference in plasma levels between slow and rapid

metabolisers." (A39-40 at 2:64-65; 3:36-41 (emphasis added)) The

specification continues: "The pharmaceutical compositions of *the*

*present invention* comprise the (–)-enantiomer of omeprazole as active

ingredient, or a pharmaceutically acceptable salt thereof, and may also

contain a pharmaceutically acceptable carrier and optionally other

therapeutic ingredients." (A40 at 4:9-14 (emphasis added))

The '192 patent contains 23 claims. Claims 1-11 and 23 are

directed to methods for treatment of gastric acid related diseases.

Claim 1 is representative:

> 1. A method for treatment of gastric acid related diseases by inhibition of gastric acid secretion comprising administering to a mammal in need of treatment a therapeutically effective amount of a proton pump inhibitor consisting essentially of [esomeprazole] or a pharmaceutically acceptable salt thereof, so as to effect decreased interindividual variation in plasma levels (AUC) during treatment of gastric acid related diseases.

(A42 at 7:18-27) Claims 12-22 are directed to methods for the

production of a medicament for treating gastric acid related diseases.

Claim 12 is representative:

12. A method for the production of a medicament for treating gastric acid related diseases, which comprises: combining a therapeutically effective amount of a proton pump inhibitor consisting essentially of [esomeprazole] or a pharmaceutically acceptable salt thereof, with a pharmaceutically acceptable carrier.

(A42 at 8: 8-16)

## C.    The Patent Prosecution.

The originally filed claims in the application that led to the '504 patent were directed to, *inter alia*, an optically pure enantiomeric compound comprising "a $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt" of esomeprazole or the other enantiomer, (+)-omeprazole.  (A82)  Following the first substantive office action, in which the examiner rejected the originally presented claims (A3047-50) and before AstraZeneca filed a response, one of the inventors and his attorneys conducted an in-person interview with the patent examiner.  The Examiner's Interview Summary Record includes the following comments:

1.  A pharmaceutical formulation for oral administration of pure solid state (–)-enantiomer  of omeprazole Na-salt may be allowable after reviewing the data in affidavit form.
2.  This is because the prior art teaches that (+),(–), (+,–) show the same activity in vitro ….
3.  The scope of the claim will depend on the data submitted.

(A3052)

AstraZeneca then submitted an amendment (A3229-3242)

accompanied by the Declaration of Dr. Tommy Andersson, an

AstraZeneca scientist. (A3245-3266) In the amendment, AstraZeneca

cancelled the original claims and substituted the claims that eventually

issued in the '504 patent. (A3230-3231) The newly added independent

claims (*e.g.*, application claim 35, which became patent claim 1) called

out a "pharmaceutical formulation" comprising "a pure solid state

alkaline salt" of esomeprazole. Dependent claims (*e.g.*, application

claim 37, which became patent claim 3) further limited the alkaline salt

to the six exemplary salts described in the specification. (A3230)

In his declaration, Dr. Andersson reported the results of two

studies. Study A compared the pharmacokinetics of the monovalent

sodium salts of (–)-omeprazole (*i.e.*, esomeprazole) and (+)-omeprazole

with the sodium salt of racemic omeprazole. (A3246) Study B

compared treatment results using the divalent magnesium salt of

esomeprazole and a non-salt racemic omeprazole. (A3246-47) Dr.

Andersson concluded from the data that alkaline salts of esomeprazole

unexpectedly demonstrate a more advantageous pharmacokinetic

profile in terms of inter-individual variation than both the (+)-enantiomer and the racemic mixture of omeprazole, which was contrary to reports in the prior art. (A3247, 3257-58) Nothing in the declaration suggested, much less expressly stated, that the data on monovalent and divalent salts represented the effects of only the six salt species specifically disclosed in the specification, as opposed to all monovalent and divalent alkaline salts.

In its remarks accompanying the amendment, AstraZeneca explained that Dr. Andersson's declaration "discusse[d] clinical studies which involved both the monovalent sodium salt and the divalent magnesium salt of the (–)-enantiomer of omeprazole, thus supporting the full scope of the genus of alkaline salts disclosed in the application and as claimed herein, as *suggested by the Examiner at the interview*." (A3233 (emphasis added)) AstraZeneca further urged that "pure solid state alkaline salts of the (–)-enantiomer of omeprazole to which the new claims are directed" were patentable over the prior art. (A3237) Again, nothing in the remarks suggests, much less expressly states, that the data from monovalent and divalent salts is representative of only the six salts disclosed in the specification.

The examiner's notice of allowance of the '504 patent followed shortly thereafter.  (A3267-68)  Neither party has cited to the prosecution history of the '192 patent to defend their respective claim constructions.

## SUMMARY OF ARGUMENT

The district court erred in departing from the general rule that the ordinary and customary meaning of a patent claim term is presumed to be the correct construction.  Such a departure is justified only when a patent specification or prosecution history contains some special definition of a claim term or otherwise contains words of manifest exclusion or clear and unambiguous disavowal of the ordinary meaning.  Nothing of the sort is present here.  In fact, the prosecution history cannot be reconciled with the district court's limited construction of "alkaline salt."

The intrinsic record demonstrates that "alkaline salt" in the '504 patent should be given its ordinary and customary meaning, about which there is no dispute.  An "alkaline salt" is just that:  a "salt" that is "alkaline."  Persons skilled in the art know that a salt is a chemical compound made up of two types of ions:  "cations" (*i.e.*, positively

charged ions) and "anions" (*i.e.*, negatively charged ions). An "alkaline" salt is one that yields a basic solution (*i.e.*, having a pH above 7) in water. AstraZeneca argued that the term "pharmaceutically acceptable salt" in the '192 patent should have the same meaning.

The district court nonetheless erroneously concluded that the '504 patent specification unambiguously establishes that the "present invention" described in the patent is limited to the six named salt species on the basis of one sentence that describes "[t]he present invention" as "the new $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts of the single enantiomers of omperazole" and because the Abstract of the Invention identifies those six salts. (A10-13; A26, A27 at 2:42-44) This is not a fair reading of the specification and more importantly ignores the remainder of the intrinsic evidence.

Contrary to the district court's conclusion, the '504 patent specification contains other passages that describe "the present invention" more broadly, using language that does not require a salt having any particular cation. The specification describes "the present invention" as, *inter alia*:

- "new compounds of high optical purity and crystalline salts thereof" (A27 at 1:8-14)

- "novel salts of single enantiomers of omeprazole" (A27 at 1:50-55)

- "pure crystalline enantiomeric salts of omeprazole and methods for preparation thereof" (A27 at 1:56-58)

- "[a]lkaline salts of the single enantiomers" (A29 at 5:7-11)

These statements alone undermine the district court's premise that the patent specification "unambiguously" defines the "invention" as only the six enumerated salt species. (A11) Indeed, the specification explicitly states that the "[a]lkaline salts of the single enantiomers of the invention" are "*exemplified by*"—not "defined by"—the six enumerated salts. (A29 at 5:7-11 (emphasis added))

Moreover, the '504 patent prosecution history, which goes unmentioned in the district court's opinion, shows clearly that AstraZeneca and the patent examiner believed that the data on two representative alkaline salts in the Andersson declaration supported a claim to the genus of "alkaline salts" of esomeprazole. Dr. Andersson demonstrated unexpectedly superior clinical results from the esomeprazole enantiomer using formulations with both a monovalent (Group IA) salt (sodium) and a divalent (Group IIA) salt (magnesium). The examiner had stated that "the scope of the claim will depend on the

data submitted." (A3052) The data showing the superior results of esomeprazole in different salt forms clearly convinced the examiner to allow claims to "alkaline salts" of esomeprazole.

Finally, and also importantly, the very structure of the claim set in the '504 patent demonstrates the unambiguous intent of the patent applicants to claim the genus of "alkaline salts" in the independent claims and to more specifically claim the six enumerated salt species in the dependent claims. To read the claims as the district court did effectively nullifies the dependent claims. Under this Court's law, such a construction is permissible only where the intrinsic evidence clearly and absolutely requires it. That is not the case here.

Given this record, the district court should have accorded "alkaline salt" in the '504 patent its ordinary and customary meaning. Accordingly, this Court should reverse the district court's final judgment, and adopt AstraZeneca's claim construction of "alkaline salt." This Court should also reverse the district court's construction of "pharmaceutically acceptable salt" in the '192 patent because the district court premised its construction of that term on its erroneous and unduly narrow construction of "alkaline salt" in the '504 patent.

## STANDARD OF REVIEW

The sole issue in this appeal is one of claim construction. Claim construction is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996), that the Court reviews *de novo*. *Cybor Corp. v. FAS Techs, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*).

## ARGUMENT

**A. The District Court's Constructions Contravene the Undisputed Ordinary and Customary Meaning of "Alkaline Salt" and "Pharmaceutically Acceptable Salt."**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). A court therefore "look[s] to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* A claim term is generally given its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

This Court has established a "heavy presumption" that a claim term carries its ordinary and customary meaning. *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). Thus, the

ordinary meaning of "alkaline salt" and "pharmaceutically acceptable salt" is the presumptively correct construction.

The ordinary and customary meaning of "alkaline salt" is not in dispute. As noted above, the term "salt" has a well understood ordinary meaning—a chemical compound made up of positively charged cations and negatively charged anions. (A5353-54 at ¶35) An "alkaline" salt is a salt that is basic; that is, one that generates basic solutions in water or is generated under basic conditions. This is in contrast to an acidic salt, which generates acidic solutions in water or is formed under acidic conditions. (A5354 at ¶36; A7350 at 72-73) AstraZeneca agreed that the term "pharmaceutically acceptable salt" in the '192 patent should be given the same meaning as the "alkaline salt" term in the '504 patent (A5267-5270) and the district court's opinion does so. (A16-18)

Had the district court followed the presumption that the ordinary and customary meaning controls, it would have adopted AstraZeneca's construction. It committed error by not doing so.

## B.     The Intrinsic Record Does Not Justify Departure From the Ordinary and Customary Meaning Here.

Departure from ordinary meaning is warranted only "'when a patentee sets out a definition and acts as his own lexicographer,' or

'when the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Woods* v. *DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1283 (Fed. Cir. 2012) (citation omitted). The standard for finding such a disavowal is "exacting." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Here, neither the patent specifications nor the prosecution histories meet this "exacting" standard. In fact, nowhere in the intrinsic record did the inventors define or limit the phrases "alkaline salt" or "pharmaceutically acceptable salt" of esomeprazole in a manner that would cabin these claim elements to only six specific types of alkaline salts of esomeprazole. To the contrary, the intrinsic record shows that the inventors intended to give the term "alkaline salt" of esomeprazole a broad meaning.

**1.    The Patent Specifications Do Not Clearly or Uniformly Limit the Claims to Only the Six Exemplary Salt Species.**

To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365. "It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must *clearly express an intent*

to redefine the term." *Id.* (emphasis added). The standard for finding a disavowal is "similarly exacting." *Id.* at 1366. Such a disavowal must be clear and unambiguous, whether by words of manifest exclusion in the patent specification, *see, e.g.*, *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002), or by clear and unambiguous statements in the prosecution history. *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

The district court read the '504 specification to be "clear" and to "consistently state[] that the compounds of the invention are the identified five inorganic salts ($Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$) and the one organic genus of salts ($N^+(R)_4$) of an enantiomer of omeprazole." (A11) In support of that premise, the court cited only two passages from the '504 patent: (i) the abstract, which identifies "The novel optically pure compounds $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$ salts of [esomeprazole]" and (ii) a sentence from the Detailed Description of the Invention which states: "The present invention refers to the new $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts of the single enantiomers of omeprazole, …" (A11) The court then concluded that "[t]hus, the specification unambiguously

establishes that the 'present invention' is limited to the six named salt species." (A11)

It is neither fair nor reasonable to read the patent specification as so limiting. The two passages cited by the district court are not part of any "clear" or "consistent" pattern. To the contrary, the patent specifications use the phrase "the present invention" or "the invention" in other, equally important passages to refer much more broadly to the genus of alkaline salts claimed. For example, the '504 patent specification states:

- "The *present invention* is directed to new compounds of high optical purity and crystalline salts thereof" (A27 at 1:8-14 (emphasis added))

- "The *present invention* provides such compounds, which are novel salts of single enantiomers of omeprazole" (A27 at 1:50-55 (emphasis added))

- "A preferred embodiment of the *present invention* provides pure crystalline enantiomeric salts of omeprazole and methods for preparation thereof" (A27 at 1:56-58 (emphasis added))

- "Alkaline salts of the single enantiomers of the *invention* . . . ." (A29 at 5:7-11 (emphasis added))

These passages contradict the district court's conclusion that the patent specification "consistently" or "unambiguously" defines the "invention" as limited to the six enumerated salt species.

Indeed, the last-cited passage of the '504 patent specification explicitly states that the "[a]lkaline salts of the single enantiomers *of the invention*" are "*exemplified by*" the six enumerated salts.  (A29 at 7-11 (emphasis added))[5]  Later, the specification introduces the specific methods of preparing sodium and magnesium salts as "examples" of "the invention":

> *The invention is illustrated by the following examples* using preferred procedures for the preparation of optically pure sodium salts and magnesium salts.

(A29 at 6:26-28 (emphasis added))  These statements make clear the patentees' intention that the six enumerated alkaline salts are exemplary, not limiting.

"To find a special definition mandated by the written description, a term must be 'clearly' redefined, and an 'express intent' to do so must be evident from the patent." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 565-566 (Fed. Cir. 2013) (citation omitted).  In contrast,

---

[5] The district court stated that "when read in context" the "exemplified by" phrase in the patent specification "does not broaden the scope of the subject matter disclosed earlier in the specification." (A12)  But the district court never explained how a contextual reading of this passage in the specification of the '504 patent leads to that conclusion, and reasonably it cannot.

"exemplary" language, such as that used in the '504 patent, reflects an intention *not* to limit the scope of "the invention" to the specific examples of alkaline salts given in the specification. *Cf. Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002) (equating the phrase "such as" with "exemplified" and holding that such language does not limit a genus to the exemplary species).

In a similar vein, the '192 patent specification uses the phrase "present invention" to refer to a pharmaceutically acceptable salt of esomeprazole without specifying the salt cation:

- "*The present invention* is related to the use of one of the single enantiomers of omeprazole, i.e.[,] the (–) enantiomer of [omeprazole] or a pharmaceutically acceptable salt thereof, in the treatment of gastric acid related diseases." (A39 at 1:16-21 (emphasis added))

- "[I]t has also been found, according to *the present invention*, that administration of the (–)-enantiomer of omeprazole or an acceptable therapeutical salt thereof results in a less pronounced difference in plasma levels between slow and rapid metabolisers." (A40 at 3:36-41 (emphasis added))

- "The pharmaceutical compositions of *the present invention* comprise the (–)-enantiomer of omeprazole as active ingredient, or a pharmaceutically acceptable salt thereof, and may also contain a pharmaceutically acceptable carrier and optionally other therapeutic ingredients." (A40 at 4:9-14 (emphasis added))

In fact, the '192 patent specification, although a continuation-in-part of the application that led to the '504 patent, refers only generically to "the alkali metal salts of (–)-omeprazole" (A42 at 7:3-9) and contains no reference to any specific salt of esomeprazole. This is consistent with the fact that the '192 patent reports additional data relating to the unexpectedly superior results achieved by pharmaceutical formulations containing the esomeprazole enantiomer compared to racemic omeprazole. (A40-42 at 4:60-7:16) Read in context, the '192 patent specification indicates that the particular salt form is not nearly so important as the use of the esomeprazole enantiomer as the "active ingredient" rather than the omeprazole racemate. (*See, e.g.*, A36-38 at FIGS. 1-3B)

This Court has repeatedly held that statements characterizing the "present invention" will *not* limit the scope of the claims to particular embodiments unless the intrinsic evidence *uniformly and consistently* supports that narrow construction. *See, e.g.*, *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008); *Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008); *Rambus Inc. v. Infineon*

*Techs. AG*, 318 F.3d 1081, 1094 (Fed. Cir. 2003); *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir. 1999).

*Rambus* and *Karlin* are controlling here.  In *Rambus*, this Court reversed a district court decision that construed the term "bus" more narrowly than its ordinary and customary meaning based on isolated statements in the specification about the "present invention."  318 F.3d at 1094-95.  This Court noted that while some of the statements "taken alone" may have suggested some limitation of the term "bus," "the remainder of the specification and prosecution history show[ed] that Rambus did not clearly disclaim or disavow such claim scope."  *Id*.  This Court observed that while statements about the "present invention" may sometimes limit the meaning of claim terms in patent cases, "such language *must be read in context of the entire specification and the prosecution history*."  *Id.* at 1094 (emphasis added).  In reviewing the entire specification and prosecution history in *Rambus*, the Court found no clear intent by the inventors to limit the scope of the claimed "bus."  *Id.* at 1095.  The same is true here because the intrinsic evidence indicates a clear intent to claim the genus of pharmaceutical formulations containing "alkaline salts" of esomeprazole.

Similarly, in *Karlin*, this Court reversed a district court decision that construed the term "series of threads" more narrowly than its plain and ordinary meaning based upon certain language in the specification that described the "present invention" as having highly specialized interrupted threads. The district court had limited the disputed term to such interrupted threads. 177 F.3d at 971-73. This Court reversed for a number of reasons. *Id.* First, this Court noted that the district court's narrow reading would render original dependent claim 9 redundant of independent claim 1, in violation of the doctrine of claim differentiation. *Id.* at 971-72. Second, statements in the specification describing the "present invention" appeared simply to describe preferred embodiments. *Id.* at 972-73. Third, the prosecution history did not favor the district court's narrow interpretation, but rather supported a broad ordinary meaning of "series of threads," especially because the applicant considered "series of threads" in claim 1 to have a different and broader scope than claim 9, in which the threads *were* limited to threads that were interrupted. *Id.* at 973-74. The same three factors apply in this case: (i) the district court has read dependent claims 3 and 10 of the '504 patent as redundant; (ii) other uses of "the present invention" in

the patent specifications indicate that the "invention" was not limited

only to the six exemplary salts; and (iii) the prosecution history

indicates that both AstraZeneca and the patent examiner believed that

the record supported a broad claim to the genus of "alkaline salts."[6]

The district court's reliance on the abstract of the '504 patent is

equally flawed. A patent abstract is by its nature an abridged

recitation of the invention, and thus particularly unlikely to convey the

full scope of claimed subject matter. *Innova/Pure Water, Inc. v. Safari

Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004) (giving

little weight to accused infringer's argument that statement in the

Abstract supported narrow claim construction). The mere mention of

the six exemplary salts in the abstract of the '504 patent does not

---

[6] While *Rambus* and *Karlin* are most on point, additional precedents
from this Court have similar import. *See, e.g.*, *Absolute Software*, 659
F.3d at 1136-37 ("[U]se of the phrase 'present invention' or 'this
invention' is not always so limiting, such as where the references to a
certain limitation as being the 'invention' are not uniform, or where
other portions of the intrinsic evidence do not support applying the
limitation to the entire patent."); *Praxair*, 543 F.3d at 1326 (description
of "this invention" as having uniform capillary structure contradicted by
other statements indicating that uniform capillaries were only a feature
of certain embodiments); *Voda*, 536 F.3d at 1320 (declining to limit
claim where specification described "present invention" as having a
"straight portion" where other portions of specification described
invention without requirement that it be "straight").

outweigh the remainder of the intrinsic evidence that weighs in favor of

a broader construction of "alkaline salt."

> **2.    The Prosecution History Confirms The Patentees' Intent to Claim the "Alkaline Salts" Genus.**

The prosecution history of the '504 patent eliminates any

possibility that the applicants intended "alkaline salt" to have a scope

limited to the six particular exemplary salts listed in the specification.

When AstraZeneca originally filed the application for the '504 patent,

the broadest compound claim *was* limited to these six species of salts.

Original application claim 1 recited:

> 1.    An optically pure enantiomeric compound comprising a $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt of [(+)-omeprazole] or [(−)-omeprazole], wherein R is an alkyl with 1–4 carbon atoms.

(A82)

Following an interview in which the examiner noted that the

ultimate scope of the claims would depend "on the data submitted,"

(A3052), AstraZeneca cancelled all 34 of the original application claims

and added new claims 35-44, which later issued as claims 1-10 of the

'504 patent.  (A3230-3231)  Application claim 35 (which ultimately

became patent claim 1) replaced cancelled original claim 1, and used

- 35 -

the *broader* term "alkaline salt," thereby expanding coverage beyond the six salts that had previously been claimed. (*Id.*)

In its remarks accompanying the amendment, AstraZeneca argued that the broad claim term "alkaline salt" was supported by the data submitted in the Andersson declaration and that the results were not limited to the particular salt formulations used in the experiments or described in the specification (all emphases added):

> The new claims reflect the patentable distinctions discussed during the interview and are drawn to a pharmaceutical formulation comprising a pure solid state *alkaline salt* of the (–)-enantiomer of omeprazole and a pharmaceutical carrier.

(A3232)

\* \* \* \*

> The Andersson Declaration discusses clinical studies which involved both the monovalent sodium salt and the divalent magnesium salt of the (–)-enantiomer of omeprazole, thus supporting the *full scope of the genus of alkaline salts* disclosed in the application and as claimed herein, as suggested by the Examiner at the interview.

(A3233)

\* \* \* \*

> As shown in the Andersson Declaration the [esomeprazole] enantiomer, as administered in the form of its *alkaline salts*, unexpectedly exhibits a different and more advantageous pharmacokinetic profile than the racemic mixture or the (+)-enantiomer of omeprazole.

(*Id.*)

* * * *

The results of both studies described in the Declaration demonstrate the advantageous in vivo effects of the *alkaline salts*, e.g., Na$^+$ or Mg$^{+2}$, of (–)-omeprazole.

(A3234)

* * * *

Thus, the clinical results presented in the Andersson Declaration demonstrate that the alkalkine salts of the (–)-enantiomer of omeprazole exhibit pharmacokinetic advantages compared to the racemic form of omeprazole or alkaline salt of racemic omeprazole or the *alkaline salts* of (+)-omeprazole by virtue of higher dose efficiency and significantly less interindividual variation between patients in the treatment of gastric acid-related diseases.

(A3236)

* * * *

As discussed at the interview, the pharmaceutical formulations for oral administration comprising pure solid state *alkaline salts of the (–)-enantiomer of omeprazole* to which the new claims are directed, are patentable over the prior art and the cited references.

(A3237)

The examiner allowed *both* the new broad independent claims reciting "alkaline salt" *and* the new narrower dependent claims reciting only the six salt species. (A3267-68)

- 37 -

The district court's view that the term "alkaline salt" in the independent claims is coextensive with the limitations directed to the six specific salt species in the dependent claims is clearly incompatible with this prosecution history, which goes unmentioned in the district court's opinion. (A10-13, A16-18) The court should have concluded that the prosecution history supports AstraZeneca's position that the term "alkaline salt" used in the independent claims must be broader than the six salt species enumerated in the dependent claims. *See, e.g.*, *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) ("If, as SunRace contends, the shift actuators in claim 16, and thus in claim 27, were already limited to those containing a cam, there would have been no difference between claim 24 and claim 27. Yet the patent examiner deemed both claim 24 and claim 27 to be patentable . . . . We infer from that course of events that [the applicant] and the examiner regarded claim 24 as adding something—the cam means—to the limitations found in claim 16 as amended in reexamination.").

### 3. Nothing in the Intrinsic Record Overcomes the Presumption That the Dependent Claims Narrow the Independent Claims.

The district court's decision also cannot be squared with the doctrine of claim differentiation. When a patent claim lacks a

limitation that another claim possesses, that limitation should not be read into the former claim, because a presumption exists that different claims have different scope. *SunRace*, 336 F.3d at 1303. "That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim" and where, as here, "one party is urging that the limitation in the dependent claim should be read into the independent claim." *Id.*; *see also, e.g.*, *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1361 (Fed. Cir. 2012); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

The presumption in this instance draws strength from the Patent Statute, which provides that "a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." 35 U.S.C. §112(d). The presumption can be cast aside only in the face of "strong contrary evidence such as definitional language in the patent or a clear disavowal of claim scope." *Interdigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1324-25 (Fed. Cir. 2012). As the *Interdigital* court explained:

> The logic of the situation is as powerful as it is simple: if the term "code" means "spreading code," then claim 1 recites a

device in which the signals are "generated using a same
[spreading] code," and claim 5 covers exactly the same
subject matter.  If the claim drafter had intended to limit
claim 1 to spreading codes, as the administrative judge
concluded, it would have been much simpler for the drafter
to explicitly recite the "spreading code" limitation in claim 1
and omit dependent claim 5 altogether.

*Id.* at 1325.

Here, the only meaningful difference between independent claim 1
and dependent claim 3 in the '504 patent is that the latter claim
narrows the scope of the "alkaline salts" in claim 1 to six specific
alkaline salts.  (A33 at 14:6-10, 13-15)  The same is true of the
relationship between dependent claim 10 and independent claims 6 and
7.  (A33 at 14:21-34, 48-49)  By reading "alkaline salt" in claim 1 as
being limited to the six specific salts recited in claim 3, the district court
rendered the dependent claims identical in scope to the independent
claims, and thus redundant.  The logic applied in *Interdigital* applies
with equal force here:  If AstraZeneca had intended to limit the
independent claims to the six specific salt species enumerated in the
'504 patent specification as the district court concluded, AstraZeneca
would have explicitly recited the six salt species in the independent
claims and omitted the dependent claims altogether.  Indeed, as has

been shown, that was precisely what AstraZeneca did in the original application claims, before it presented Dr. Andersson's data, which the examiner agreed would support the broader "alkaline salt" genus claims. The reading that is more consistent with the structure of the claims and the prosecution history is that the dependent claims "specify a further limitation" of the subject matter claimed in the independent claims, exactly as the Patent Statute contemplates. 35 U.S.C. §112(d).

The district court relied on *Seachange International, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) and *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) for the proposition that "the doctrine of claim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history" and that "[c]laim differentiation is a guide, not a rigid rule." (A12) The court rejected AstraZeneca's argument that the presence of the limitations to the six specific salt species in the dependent claims indicated that the court should construe the "alkaline salt" term in the independent claims of the '504 patent more broadly because it believed that the intrinsic evidence required a more narrow construction. (A12)

*Seachange* and *Laitram* are inapposite here. The claim
differentiation issue in *Seachange* involved a comparison between two
independent claims that used different language to define the same
element. It was in this context that this Court noted that the
presumption that different claims in a patent have different scope was
"not a hard and fast rule and will be overcome by a contrary
construction dictated by the written description or prosecution history."
413 F.3d at 1369. After examining that intrinsic evidence in detail, the
Court concluded that the patentee's arguments made to avoid the prior
art during prosecution had narrowed the limitation in independent
claim 1 ("network for data communications") so as to be coextensive
with the corresponding limitation in independent claim 37 (requiring
"point-to-point interconnections"). *Id.* at 1369-1375.

*Laitram* involved a claim term written under 35 U.S.C. §112, ¶6
in which the Court construed the means-plus-function limitation
(means for joining) in the independent claim to include corresponding
structure (a cross member) even though a cross member was also called
out in a dependent claim. 939 F.3d at 1538. In that context, the Court
held that "the judicially developed guide to claim interpretation known

as 'claim differentiation' cannot override the statute [governing interpretation of means-plus-function claims]."  *Id.*  Moreover, the Court was careful to explain that under its construction of the disputed claim language, the compared claims did not "have exactly the same scope and, thus, claim differentiation [wa]s maintained."  *Id.*

Nothing in the present record is analogous to the facts of these two cases.  Rather, as was the case in *Karlin*, the doctrine of claim differentiation, taken in conjunction with the full weight of the intrinsic evidence, indicates that AstraZeneca claimed the genus of pharmaceutical formulations containing "alkaline salts" of esomeprazole, and not only the six exemplary salts described in the '504 patent and called out in the dependent claims.  *See Karlin*, 177 F.3d at 971-72 ("The doctrine of claim differentiation also supports a construction of 'series of threads' that is not limited to the preferred embodiment's highly specialized interrupted threads.  This doctrine . . . normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend.").

# CONCLUSION

For all of the reasons stated above, the district court erred as a matter of law in construing the terms "alkaline salt" and "pharmaceutically acceptable salt" of esomeprazole in the '504 and '192 patents, respectively, as being limited to the six exemplary embodiments listed in the specification of the '504 patent. This Court should reverse the district court's construction, adopt AstraZeneca's claim construction, and remand the matter to the district court for further proceedings.

Respectfully submitted,

/s/ *Jay I. Alexander*
Jay I. Alexander
Einar Stole
Eric R. Sonnenschein
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000

Henry J. Renk
Bruce C. Haas
Joshua I. Rothman
FITZPATRICK, CELLA, HARPER
  & SCINTO
1290 Avenue of the Americas
New York, New York  10104-3800
(212) 218-2100

*Counsel for Plaintiff-Appellants
AstraZeneca AB, Aktiebolaget
Hässle, AstraZeneca L, KBI Inc.,
and KBI-E Inc.*

Dated:  September 3, 2013

CASE PARTICIPANTS ONLY

# ADDENDUM

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASTRAZENECA AB, AKTIEBOLAGET HÄSSLE, ASTRAZENECA LP, KBI INC., and KBI-E INC., <br><br>         Plaintiffs and <br>        Counterclaim Defendants <br><br>         v. <br><br> HANMI USA, INC., HANMI PHARMACEUTICAL CO., LTD., HANMI FINE CHEMICAL CO., LTD, and HANMI HOLDINGS CO., LTD., <br><br>         Defendants and <br>        Counterclaim-Plaintiffs. | Civil Action No. 3:11-cv-00760-JAP-TJB <br><br> Hon. Joel A. Pisano, USDJ <br> Hon. Tonianne J. Bongiovanni, USMJ |

RECEIVED
JUN - 3 2013
AT 8:30
WILLIAM T. WALSH
CLERK

**CONSENT ORDER AND FINAL JUDGMENT**

THIS MATTER having been opened to the Court (Hon. Joel A. Pisano, U.S.D.J.) upon the joint application of Plaintiffs AstraZeneca AB, Aktiebolaget Hässle, AstraZeneca LP (hereinafter collectively "AstraZeneca") and Plaintiffs KBI Inc. and KBI-E Inc. (hereinafter collectively "KBI") and Defendants Hanmi USA Inc., Hanmi Pharmaceutical Co., Ltd., Hanmi Fine Chemical Co., Ltd. and Hanmi Science Co., Ltd., formerly Hanmi Holdings Co., Ltd. ("Hanmi Holdings"), a company organized and existing under the laws of South Korea" (hereinafter collectively "Hanmi"), for an Order and Final Judgment by Consent; and it appearing that AstraZeneca and KBI, and Hanmi (the "Parties") have agreed to terms and conditions representing a partial resolution of this action and have set forth those terms and conditions in a Settlement Agreement, and by their respective undersigned attorneys, hereby stipulate and consent to entry of this Consent Judgment and good cause appearing,

IT IS this 3ʳᵈ day of June, 2013

**A1**

ORDERED, ADJUDGED AND DECREED as follows:

1.     This Court has jurisdiction over the subject matter of this action and has personal jurisdiction over the Parties.

2.     As used in this Consent Judgment, the term "Affiliate" shall mean, with respect to a Party, any entity or person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Party. For purposes of this definition, "control" (a) means ownership, directly or through one or more intermediaries, of (i) more than fifty percent (50%) of the shares of stock entitled to vote for the election of directors, in the case of a corporation, or (ii) more than fifty percent (50%) of the equity interests in the case of any other type of legal entity or status as a general partner in any partnership, or (b) any other arrangement whereby an entity or person has the right to elect a majority of the Board of Directors or equivalent governing body of a corporation or other entity or the right to direct the management and policies of a corporation or other entity.

3.     As used in this Consent Judgment, the term "Hanmi Product" shall mean a solid oral dosage drug product containing the esomeprazole moiety that is manufactured, sold, offered for sale or distributed pursuant to NDA No. 202-342, including any supplements or amendments to NDA No. 202-342 but excluding such supplements or amendments after May 22, 2013 that change the mode of administration or active ingredient(s).

4.     Hanmi, for itself and its Affiliates, acknowledges and agrees that AstraZeneca's U.S. Patent Nos. 5,714,504 and 5,877,192 (the "AstraZeneca Patents") are all enforceable and valid in this and in any other or future cause of action, litigation or proceeding.

**A2**

Case: 13-1490 Case: 13-1490 PARTICIPANTS ONLY Document: 58 Page: 58 Filed: 09/03/2013

Case 3:11-cv-00760-JAP-TJB   Document 338   Filed 06/03/13   Page 3 of 4 PageID: 14735
Case 3:11-cv-00760-JAP-TJB   Document 337-1   Filed 05/30/13   Page 3 of 4 PageID: 14731

5.      Under this Court's interpretation of the meaning of "alkaline salts" of U.S. Patent No. 5,714,504 and "pharmaceutically acceptable salt" of the U.S. Patent No. 5,877,192, as reported in the Court's December 12, 2012 Opinion (D.I. 257), the Hanmi Product does not infringe the AstraZeneca Patents under the provisions of 35 U.S.C. § 271.

6.      Compliance with this Consent Judgment may be enforced by the Parties and their successors in interest, or assigns.

7.      This Court retains jurisdiction to enforce or supervise performance under this Consent Judgment and the Settlement Agreement.

8.      Except as provided in the Settlement Agreement, each party shall bear its own costs and attorneys' fees.

_____
Joel A. Pisano, U.S.D.J.

3

**A3**

We consent to the form and entry of the forgoing Order and Judgment.


s/John E. Flaherty                         s/Mayra V. Tarantino
John E. Flaherty                           Allyn Z. Lite
Jonathan M.H. Short                        Michael E. Patunas
McCARTER & ENGLISH, LLP                     Mayra V. Tarantino
Four Gateway Center                         LITE DEPALMA GREENBERG
100 Mulberry Street                         Two Gateway Center, 12th Floor
Newark, New Jersey  07102                   Newark, New Jersey 07102
(973) 622-4444                              (973) 623-3000

Henry J. Renk                              Mark Boland
Bruce C. Haas                              Michael R. Dzwonczyk
Joshua I. Rothman                          Renita S. Rathinam
FITZPATRICK, CELLA, HARPER                 SUGHRUE MION, PLLC
& SCINTO                                   2100 Pennsylvania Avenue, NW Suite 800
1290 Avenue of the Americas                Washington, D.C. 20037-3213
New York, New York  10104-3800             (202) 293-7060
(212) 218-2100

Einar Stole                                John B. Scherling
COVINGTON & BURLING LLP                     SUGHRUE MION, PLLC
1201 Pennsylvania Avenue, NW                4250 Executive Square, Suite 900
Washington, DC  20004-2401                  La Jolla, California 92037
(202) 662-6000                              (858) 795-1180

*Attorneys for AstraZeneca and KBI*        *Attorneys for Hanmi*

4

**A4**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ : | |
| : | |
| ASTRAZENECA AB, et al. : | |
| : | |
| Plaintiffs, : | Civil Action No. 11-760 (JAP) |
| : | |
| v. : | |
| : | **ORDER** |
| HANMI USA, INC., et al. : | |
| : | |
| : | |
| : | |
| Defendants. : | |
| _____: | |

Presently before the Court is the parties' request for claim construction in this patent

infringement action.  For the reasons in the accompanying Opinion,

IT IS on this 10th day of December 2012,

ORDERED that the disputed claim terms in the '504 patent the '192 patent shall be

construed as set forth in the accompanying Opinion.


/s/ Joel A. Pisano_____
JOEL A. PISANO, U.S.D.J.


**A5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                            :
                            :
ASTRAZENECA AB, et al.       :
                            :
                            :
        Plaintiffs,       :         Civil Action No. 11-760 (JAP)
                            :
       v.                :
                            :        **OPINION**
HANMI USA, INC., et al.     :
                            :
                            :
                            :
        Defendants.      :
_____:

PISANO, District Judge.

Plaintiffs AstraZeneca AB, Aktiebolaget Hässle, AstraZeneca LP, KBI Inc. and KBI-E Inc. (collectively, "AstraZeneca" or "Plaintiffs") bring this patent infringement against defendants Hanmi, Inc., Hanmi Pharmaceutical Co., Ltd., Hanmi Fine Chemical Co., Ltd. and Hanmi Holdings Co., Ltd. (collectively, "Hanmi" or "Defendants") alleging that Hanmi infringed two of AstraZeneca's patents by filing with the U.S. Food and Drug Administration ("FDA") a New Drug Application ("NDA") seeking approval to market their esomeprazole strontium products prior the expiration of certain patents held by AstraZeneca.  The patents at issue are U.S Patent No. 5,714,504 (the " '504 patent") and U.S. Patent No. 5,877,192 (the " '192 patent") (together, the "patents-in-suit"), which cover pharmaceutical compositions containing alkaline salts of esomeprazole and methods of the use of such compositions to treat gastric acid related diseases.  Presently before the Court is the parties' request for claim construction.

**A6**

## I. BACKGROUND

AstraZeneca manufactures and markets Nexium, a capsule drug product containing an esomeprazole salt as the active ingredient.  Hanmi is seeking approval from the United States Food and Drug Administration to manufacture esomeprazole strontium capsules in the United States.  As part of its NDA, Hanmi submitted a Paragraph IV certification asserting that the '504 patent and the '192 patent are invalid or will not be infringed by their NDA product. Hanmi provided notice to AstraZeneca of its filing by letter dated December 29, 2010, and this lawsuit followed.

The '504 and '192 patents relate to, inter alia, pharmaceutical compounds containing esomeprazole salt active ingredients and methods to treat gastric acid related diseases by administering them.  More specifically, the asserted claims of the '504 patent (claims 1–7 and 10) are directed to "pharmaceutical formulation[s]" containing an "alkaline salt" of esomeprazole and methods of use thereof for "inhibiting gastric acid secretion" and "treatment of gastrointestinal inflammatory disease."  The asserted claims of the '192 patent (1–7, 10–19 and 21–23) are  directed to methods for the "treatment of gastric acid related diseases" with esomeprazole "or a pharmaceutically acceptable salt thereof" and to methods for the "production of a medicament for treating gastric acid related diseases" containing the same.

The parties have requested that the Court construe certain disputed terms in each of the patents-in-suit.[1]  The Court having held a claim construction hearing on the relevant issues, this Opinion addresses the proper construction of the disputed terms.

---

[1] The parties each submitted opening and responsive Markman briefs and supporting materials.  Pursuant to an Ordered entered March 12, 2012, AstraZeneca was permitted to file an additional reply brief.

## II.  LEGAL STANDARD

In order to prevail in a patent infringement suit, a plaintiff must establish that the
patent claim "covers the alleged infringer's product or process."  *Markman v. Westview
Instrs., Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).  "It is a bedrock principle
of patent law that the claims of a patent define the invention to which the patentee is entitled
the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal
quotations omitted) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.
Cir. 1996) ("we look to the words of the claims themselves ... to define the scope of the
patented invention").  Consequently, the first step in an infringement analysis involves
determining the meaning and the scope of the claims of the patent.  *Johnson Worldwide
Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1995).  Claim construction is a
matter of law, *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) *aff'd* 517
U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), therefore, it is "[t]he duty of the trial judge
... to determine the meaning of the claims at issue," *Exxon Chem. Patents, Inc. v. Lubrizoil
Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995).

Generally, the words of a claim are given their "ordinary and customary meaning,"
which is defined as "the meaning that the term would have to a person of ordinary skill in the
art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (citations omitted).
In this regard, the Federal Circuit has noted that

> It is the person of ordinary skill in the field of the invention through whose
> eyes the claims are construed. Such person is deemed to read the words used in
> the patent documents with an understanding of their meaning in the field, and
> to have knowledge of any special meaning and usage in the field. The
> inventor's words that are used to describe the invention—the inventor's
> lexicography—must be understood and interpreted by the court as they would
> be understood and interpreted by a person in that field of technology. Thus the

court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

*Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

In order to determine the meaning of a claim as understood by a person skilled in the art, a court may look to various sources from which the proper meaning may be discerned. These sources include intrinsic evidence, which consists of "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," *id.* at 1314, and extrinsic evidence "concerning relevant scientific principles, the meaning of technical terms, and the state of the art," *id.*

When considering the intrinsic evidence, the court's focus must begin and remain on the language of the claims, "for it is that language that the patentee chose to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.' " *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed.Cir.2001) (quoting 35 U.S.C. § 112, ¶ 2). The specification is often the best guide to the meaning of a disputed term. *Honeywell Int'l v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed.Cir.2006). It is improper, however, to import limitations from the specification into the claims. *Seachange Int'l v. C–COR Inc.*, 413 F.3d 1361, 1377 (Fed. Cir. 2005). The court may also consider as intrinsic evidence a patent's prosecution history, which is evidence of "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

While a court is permitted to turn to extrinsic evidence, such evidence is generally of less significance and less value in the claim construction process. *Id.* at 1317. Extrinsic evidence is evidence that is outside the patent and prosecution history, and may include expert testimony, dictionaries, and treatises. *Id.* The Federal Circuit has noted that caution must be exercised in the use of extrinsic evidence, as this type of evidence may suffer from inherent flaws affecting its reliability in the claim construction analysis. *Id.* at 1319 ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms."). While "extrinsic evidence may be useful to the court, ... it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Extrinsic evidence may never be used to contradict intrinsic evidence. *Id.* at 1322–23.

## III. CONSTRUCTION OF CLAIM TERMS

A. '504 Patent

1.      "*alkaline salt*"

The term "alkaline salt" appears in independent claims 1, 6 and 7 and by dependence in claims 2 and 4. Claim 1 is representative: "A pharmaceutical formulation for oral administration comprising a pure solid state alkaline salt of the (-)-enantiomer of 5-methoxy-2[[(4-methoxy-3, 5-dimethyl-2-pyridinyl)methyl]sulfinyl]- 1H-benzimidazole and a pharmaceutically acceptable carrier." '504 patent, claim 1.

Hanmi contends that the term "alkaline salt" as used in the claims should be construed as "$Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt." AstraZeneca construes the term as "a basic salt (here, a salt in which (-)-omeprazole is negatively charged) that is suitable for use in a pharmaceutical formulation." Both parties agree that "alkaline salt" is not defined in the

claims. Hanmi asserts, however, that the specification clearly defines the term as encompassing only the $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts and no others. AstraZeneca responds that the specification merely identifies these salts as examples of alkaline salts.

The Court finds AstraZeneca's arguments unavailing and agrees with Hanmi that here the patentee has given a definition to "alkaline salts" which governs construction of this term. The '504 patent is clear and consistently states that the compounds of the invention are the identified five inorganic salts ($Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$) and the one organic genus of salts ($N^+(R)_4$) of an enantiomer of omeprazole. For example, the Abstract of the '504 patent specification describes the subject matter of the patent as follows:

> "The novel optically pure compounds $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$ salts of [the enantiomers of omeprazole] … processes for the preparation thereof and pharmaceutical preparations containing the compounds as active ingredients, as well as the use of the compounds in pharmaceutical preparations and intermediates obtained by preparing the compounds."

'504 patent, Abstract.

The "Detailed Description of the Invention" similarly states that "[t]he present invention refers to the new $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts of the single enantiomers of omeprazole, where R is an alkyl with 1-4 carbon atoms, i.e. $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salts of (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl] sulfinyl]-1H-benzimidazole and (-)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl] sulfinyl]-1H-benzimidazole, where R is an alkyl with 1-4 carbon atoms." '504 patent, col. 2, lines 42-49 (emphasis added). Thus, the specification unambiguously establishes that the "present invention" is limited to the six named salt species.

AstraZeneca argues that the term "alkaline salts" should be given a broad and ordinary meaning, and contends that the term is not limited to merely the salts identified in the

specification.  In particular, it points to the doctrine of claim differentiation, which creates a

presumption against constructions that would render a claim meaningless in its entirety by

making it identical in scope to another claim.  *See Phillips*, 415 F.3d at 1315 (noting that "the

presence of a dependent claim that adds a particular limitation gives rise to a presumption that

the limitation in question is not present in the independent claim").  Here, for example, claim

1 reads "A pharmaceutical formulation for oral administration comprising a pure solid state

alkaline salt …" and dependent claim 3 reads: "The pharmaceutical formulation according to

claim 1 wherein the alkaline salt is a $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt."  Thus, the

doctrine creates a presumption that "alkaline salts" in claim 1 is broader than the six salt

species identified in claim 3.  However, the doctrine of claim differentiation is "not a hard and

fast rule and will be overcome by a contrary construction dictated by the written description

or prosecution history."  *Seachange Int'l, Inc. v. C–COR, Inc.*, 413 F.3d 1361, 1369 (Fed.

Cir.2 005).  Indeed, "[c]laim differentiation is a guide, not a rigid rule."  *Laitram Corp. v.

Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)).  In light of the relevant intrinsic

evidence, the Court is not persuaded by AstraZeneca's claim differentiation argument.

AstraZeneca also points to the following sentence in the specification, placing great

emphasis on the term "exemplified by" in arguing that the salt forms in claims 3 and 10 are

merely examples: "Alkaline salts of the single enantiomers of the invention are, as mentioned

above, beside the sodium salts (compounds Ia and Ib) and the magnesium salts (compounds

IIa and IIb), exemplified by their salts with $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$, where R is an alkyl with

1-4 C-atoms."  '504 patent, col. 5, lines 7-11.  However, the Court agrees with Hanmi that

when read in context this phrase does not broaden the scope of the subject matter described

earlier in the specification, which limits the inventions scope to the six identified salts.  The

Court, therefore, adopts Hanmi's proposed construction and construes "alkaline salt" to mean $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt.

2.    "*(-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole*"

This term stands alone in claims 1, 3-7 and 10, and is modified by the term "optically pure" in claim 2.  The Court has previously construed this claim term in a related action, *AstraZeneca v. Dr. Reddy's Laboratories, Ltd.*, 05-5553 (JAP) (the "DRL Action").  In that action, the Court construed the term "(-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole" to mean (-)-omeprazole of high optical purity, specifically, in at least 94% enantiomeric excess ("e.e.").  Where "(-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole" appear in the claims modified by the term "optically pure," the Court construed this to mean (-)-omeprazole that was essentially free of the (+)-enantiomer of omeprazole, specifically, in at least 98% e.e.  AstraZeneca urges the Court to adopt those constructions here.

Hanmi, on the other hand, has asked the Court to reconsider its earlier construction of this term.  Raising argument similar to those raised in the DRL Action, Hanmi proposes that the Court construe term "(-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole" to mean "(-)-omeprazole" or "(-)-enantiomer of omeprazole."  Where the term is modified by "optically pure," Hanmi proposes that the Court construe the term to mean "essentially free of (+)-omeprazole alkaline salt, i.e., the single enantiomer."

The Court has carefully considered Hanmi's arguments but remains unpersuaded that its earlier construction should be modified.   For the reasons set forth in its Opinion in the DRL Action, the Court shall construe "(-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole" to mean "(-)-omeprazole in at least 94% enantiomeric excess," and when the term is modified by "optically pure", "in at least 98% enantiomeric excess."

3.      *"administration of…"; "administration to…" and "a mammal including man in need of treatment"*

The term "administration of" appears in claim 6, while "administration to a mammal including man in need of such treatment" appears in claim 7.  Claim 6 reads as follows:

> A method of inhibiting gastric acid secretion comprising the oral *administration of* a pharmaceutical formulation comprising a therapeutically effective amount of a pure solid state alkaline salt of the (-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole and a pharmaceutically acceptable carrier.

Claim 7 of the '504 patent reads as follows:

> A method for the treatment of gastrointestinal inflammatory disease comprising the oral *administration to a mammal including man in need of such treatment* of a pharmaceutical formulation comprising a therapeutically effective amount of a pure solid state alkaline salt of the (-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1Hbenzimidazole and a pharmaceutically acceptable carrier.

AstraZeneca argues that no construction is necessary for these disputed terms as their ordinary and customary meaning would be clear to one skilled in the art.  Hanmi, on the other hand, contends that the "administration" terminology in claims 6 and 7 means "the prescription by a physician or other licensed healthcare professional, dispensing and ingestion," and Hanmi further contends that the phrase "a mammal including man in need of

such treatment" means "a mammal including man whom the need for treatment of gastrointestinal inflammatory disease is recognized and/or appreciated by the physician or other licensed healthcare professional."

Turning first to the "administration" terms, the Court finds that Hanmi's proposed definition lacks support and is somewhat at odds with the claim language itself. Hanmi's proposed definition would define "administration" to include "prescription by a physician or other licensed healthcare professional," as well as "dispensing." Hanmi contends that this construction is consistent with the views of a person of ordinary skill in the art in the mid-1990's," since what is claimed is a method of treatment, only a physician is capable of determining the "therapeutically effective amount" and the drug product is only available by prescription. In support of its construction, Hanmi relies in large part upon generalities about the manner in which prescription drugs ultimately reach patients. The Court finds, however, that Hanmi has not shown that such requirements should be read into the terms at issue here. Further, in both claim 6 and 7 the term "administration" is modified by "oral," that is, the claims read: "oral administration". Thus, a person of ordinary skill in the art would understand the term administration to refer to the means of delivering the medication to an individual. *See* Declaration of Dr. David Johnson ¶¶ 28-32. In light of this, Hanmi's proposed construction of the administration terms is inconsistent with the plain language of the claims.

Hanmi similarly has not shown that "a mammal including man in need of such treatment" requires a construction other than its ordinary and customary meaning. Consequently, because the Court finds that the meaning of the claim terms "administration of…"; "administration to…" and "a mammal including man in need of treatment" would be

clear to one skilled in the art, the Court declines to construe them at this time and their ordinary and customary meaning will apply.

A.   '192 Patent

1.     "*pharmaceutically acceptable salt*"

The '192 patent states that it incorporates by reference the "description of the salt forms of the single enantiomers of omeprazole and the process for making the same" from the application that ultimately issued as the '504 patent.  '192 patent, col. 1, lines 10-12.  As such, AstraZeneca contends that the term "pharmaceutically acceptable salt" should be given the same meaning as "alkaline salt" in the '504 patent.  As noted above, that construction proposed by AstraZeneca was "a basic salt (here, a salt in which (-)-omeprazole is negatively charged) that is suitable for use in a pharmaceutical formulation."  The Court rejected AstraZeneca's proposed construction of "alkaline salt" for the '504 patent claims.  *See supra*.

Hanmi proposes a number of alternative constructions for "pharmaceutically acceptable salt."  First, it proposes -- in what it describes as its "main" construction -- that the term "pharmaceutically acceptable salt" be given the same meaning as "alkaline salt" in the '504 patent.  Indeed, in its Non-Infringement and Invalidity Contentions, Hanmi asserted that the '192 patent was "limited to the expressly described salt species in the '504 patent."  *See* Non-infringement and Invalidity Contentions, D.I. 87-1 at 37).  As noted above, the Court determined that Hanmi's proposed construction -- "$Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt" -- is the appropriate construction of "alkaline salt" in the '504 patent.

Second, Hanmi proposes an "alternative" construction as follows:  "an acid or alkaline pharmaceutically acceptable nontoxic salt."  This construction is derived from the specification of the '192 patent, which states in the relevant part:

The pharmaceutical compositions of the present invention comprise the (-)-enantiomer of omeprazole as active ingredient, or pharmaceutically acceptable salt thereof, and may also contain a pharmaceutically acceptable carrier and optionally other therapeutic ingredients. *The term "pharmaceutically acceptable salt" refers to both acid and alkaline pharmaceutically acceptable nontoxic salts.* Composition comprising other therapeutic ingredients are especially of interest in the treatment of Helicobacter infections.

'192 patent, col. 4, lines 9-17 (emphasis supplied).

Finally, Hanmi proposes that the Court "meld" these constructions to arrive at "a combined construction where the acid component is broadly defined and the alkaline component is restricted per the '504 patent's definition." Hanmi Opening Br. at 21-22.

One reason Hanmi provides multiple constructions is because Hanmi challenges the validity of the incorporation into the '192 patent of the description of the salt forms of (-)-omeprazole from the parent '512 application. The relevant language reads: "The description of the salt forms of the single enantiomer of omeprazole and the process for making the same is herein incorporated by reference to copending Ser. No. 08/376512." '192 patent, col. 1, lines 10-13. Hanmi contends that if this incorporation is effective, the specification will contain conflicting information bearing on the construction of "pharmaceutically acceptable salt."

As noted by the Federal Circuit, incorporation by reference "provides a method for integrating material from various documents into a host document ... by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *Zenon Environmental, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007); *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006) (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)). In order to incorporate by reference, "the host document must identify with

detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents." *Id.* The determination of whether material has been properly incorporated by reference into a host document, and the extent to which it has been incorporated, is a question of law. *Id.* In making that determination, "the standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity." *Id.* at 1378-79 (quoting *Advanced Display*, 212 F.3d at 1282).

The Court finds this incorporation effective for its purposes here, as the plain language of the incorporation statement is clear. As such, it further finds that Hanmi's "main" proposed construction is appropriate. Because of its reference to the "salt forms of the single enantiomers of omeprazole" as described in the '504 patent, the '192 patent would be understood by one skilled in the art to be focused on the alkaline salts of esomeprazole. As discussed above, these are limited in the '504 patent to the six named species. Thus, the Court shall construe "pharmaceutically acceptable salt" in the '192 patent as "$Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ or $N^+(R)_4$ salt."

2.  "*consisting essentially of the (-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole*"

This term appears in independent claims 1, 2 and 12. The Court previously construed this term in the DRL Action to mean (-)-omeprazole in at least 98% enantiomeric excess. AstraZeneca asks the Court to adopt that construction here. Hanmi contends that the term should be construed to mean " (-)-omeprazole or the (-)-enantiomer of omeprazole that may also contain substances that do not materially affect the claimed novel properties." The Court is again unpersuaded by Hanmi's arguments that a change to the Court's prior

13

**A18**

construction is warranted. For the same reasons in the DRL action, the Court shall construe the term "consisting essentially of the (-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole" to mean (-)-omeprazole in at least 98% enantiomeric excess.

3.    "*administering to a mammal in need of treatment*"

This term appears in independent claims 1 and 2 of the '192 patent. Claim 1 is representative:

> A method for treatment of gastric acid related diseases by inhibition of gastric acid secretion comprising *administering to a mammal in need of treatment* a therapeutically effective amount of a proton pump inhibitor consisting essentially of the (-)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole or a pharmaceutically acceptable salt thereof, so as to effect decreased interindividual variation in plasma levels (AUC) during treatment of gastric acid related diseases.

AstraZeneca argues that no construction of this term is necessary as its ordinary and customary meaning would be apparent to one skilled in the art. Hanmi proposes the following construction: "the prescription by a physician or other licensed healthcare professional, dispensing and delivery by any suitable means." Hanmi contends that this construction "tracks the views of a person of ordinary skill in the art in the mid-1990's," since what is claimed is a method of treatment, and "only a physician can determine the 'therapeutically effective amount [and] the drug product is only available by prescription." Hanmi Opening Br. at 29. However, for the same reasons as discussed above with similar terms in the '504 patent, the Court rejects Hanmi's proposed construction. As the ordinary and customary meaning would be clear to one skilled in the art, the Court concludes that no construction of this term is necessary.

**A19**

**IV.  CONCLUSION**

For the reasons set forth above, the disputed claim terms will be construed as indicated.  An appropriate Order shall accompany this Opinion.


/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.


December 10, 2012

**A20**

_____
                                    :
                                    :
ASTRAZENECA AB, et al.              :
                                    :
                                    :
        Plaintiffs,                 :        Civil Action No. 11-760 (JAP)
                                    :
    v.                              :
                                    :        **ORDER**
HANMI USA, INC., et al.             :
                                    :
                                    :
                                    :
        Defendants.                 :
_____:

On December 12, 2012, this Court entered its *Markman* decision construing a number of disputed claim terms from patents-in-suit.  Presently before the Court is a motion by Plaintiffs for reconsideration of the Court's construction of the term "alkaline salt" in claim 1 of U.S. Patent No. 5,714,504 ("the ′504 patent"), which the Court construed to be limited to the six specific salt species recited in the specification.  For the reason in the accompanying Opinion,

IT IS on this 25th day of March 2013

Plaintiff′s motion for reconsideration is DENIED.


/s/ Joel A. Pisano
Joel A. Pisano, U.S.D.J.

**A21**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                              :
                                              :
ASTRAZENECA AB, et al.                        :
                                              :
                                              :
          Plaintiffs,                         :          Civil Action No. 11-760 (JAP)
                                              :
     v.                                       :
                                              :          **OPINION**
HANMI USA, INC., et al.                       :
                                              :
                                              :
                                              :
          Defendants.                         :
_____:

PISANO, District Judge.

This is a patent infringement action brought by Plaintiffs AstraZeneca AB, Aktiebolaget

Hässle, AstraZeneca LP, KBI Inc. and KBI-E Inc. (collectively, "Astra" or "Plaintiffs") against

defendants Hanmi, Inc., Hanmi Pharmaceutical Co., Ltd., Hanmi Fine Chemical Co., Ltd. and

Hanmi Holdings Co., Ltd. (collectively, "Hanmi" or "Defendants").  On December 12, 2012, this

Court entered its *Markman* decision construing a number of disputed claim terms in the asserted

patents.  Presently before the Court is a motion by Plaintiffs asking the Court to reconsider its

construction of one of those claim terms.  Specifically, Plaintiffs have moved for reconsideration

of the Court's construction of the term "alkaline salt" in claim 1 of U.S. Patent No. 5,714,504

("the ʹ504 patent"), which the Court construed to be limited to the six specific salt species recited

in the specification.

Local Civil Rule 7.1(i) governs motions for reconsideration and requires the moving

party to "set[ ] forth concisely the matter or controlling decisions which the party believes the

**A22**

Judge or Magistrate Judge has overlooked[.]"  L. Civ. R. 7.1(i).  The party seeking

reconsideration bears a heavy burden and "must show more than a disagreement with the Court's

decision."  *G–69 v. Degnan*, 748 F.Supp. 274, 275 (D.N.J. 1990).  The Third Circuit has made

clear that motions for reconsideration should only be granted in three situations: (1) when an

intervening change in controlling law has occurred; (2) when new evidence becomes available;

or (3) when reconsideration is necessary to correct a clear error of law, or to prevent manifest

injustice.  *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

Importantly, motions for reconsideration are "not a substitute for the appellate process," nor are

they "an opportunity to argue what could have been, but was not, argued in the original set of

moving and responsive papers."  *Bowers v. NCAA*, 130 F.Supp.2d 610, 613 (D.N.J. 2001).

"Because reconsideration of a judgment after its entry is an extraordinary remedy, requests

pursuant to these rules are to be granted 'sparingly.'"  *NL Indus. v. Commercial Union Ins. Co.*,

935 F.Supp. 513, 516 (D.N.J. 1996) (quoting *Maldonado v. Lucca*, 636 F.Supp. 621, 630 (D.N.J.

1986)).

Astra bases its motion on two grounds.  First, it alleges that the Court "overlooked" the

Federal Circuit's "controlling" decision in *Rambus Inc. v. Infineon Technologies*, 318 F.3d 1081,

1094-95 (Fed. Cir.  2003).  As Defendants point out, *Rambus* stands for the proposition that

claims are generally not limited to the embodiments referred to in the specification unless the

rest of the intrinsic evidence is consistent with that reading.   It was as support for that

unremarkable proposition that *Rambus* made its sole appearance in Astra's claim construction

submissions -- as part of a string cite in Astra's responsive brief.  Astra made no mention of

*Rambus* in its opening brief or at oral argument.

In its argument on this motion, the Court finds Plaintiffs to be overstating the controlling nature of *Rambus*.  Further, while the Court did not specifically cite *Rambus*, it certainly considered and addressed the basic legal principles involved in the case.  Astra's efforts here seem to be an attempt to reargue and expand upon points it previously made during the claim construction process and which have already been considered by the Court.

Second, Astra's contends that the Court, in finding that the presumption of claim differentiation had been overcome in construing the term "alkaline salts," placed "undue reliance on the language of the specification" and relied upon "inapposite" precedent.  Here again, however, Astra is in essence attempting to reargue and expand upon points previously addressed by the parties and considered by the Court.  That is not appropriate on a motion for reconsideration.

In sum, the Court finds the standards for granting the extraordinary remedy of reconsideration have not been met and, consequently, denies Astra's motion.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
Joel A. Pisano, U.S.D.J.

Dated:  March 25, 2013



THE UNITED STATES OF AMERICA

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

May 19, 2011

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,714,504*

ISSUE DATE: *February 03, 1998*

By Authority of the

Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office

P. R. GRANT

Certifying Officer

HAN0038817

**A25**

# United States Patent [19]

Lindberg et al.

[11] Patent Number: 5,714,504

[45] Date of Patent: Feb. 3, 1998

[54] COMPOSITIONS

[75] Inventors: **Per Lennart Lindberg**, Mölndal; **Sverker Von Unge**, Fjärås, both of Sweden

[73] Assignee: **Astra Aktiebolag**, Sodertalje, Sweden

[21] Appl. No.: **376,512**

[22] Filed: **Jan. 23, 1995**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 256,174, filed as PCT/SE94/00509, May 27, 1994.

[30] **Foreign Application Priority Data**

May 28, 1993 [SE] Sweden ..................... 9301830

[51] Int. Cl.$^6$ ...................... **C07D 401/12**; A61K 31/44

[52] U.S. Cl. ...................... **514/338**; 546/273.7

[58] Field of Search .................... 546/273.7; 514/338

[56] **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0005129 | 4/1981 | European Pat. Off. . |
| 0124495 | 1/1987 | European Pat. Off. . |
| 4035455 | 11/1990 | Germany . |
| 4035455 | 5/1992 | Germany . |

OTHER PUBLICATIONS

Erlandsson et al., J. Chromatography, vol.532, pp. 305–319 (1990).

Cairns, et al. "Enantioselective HPLC determination . . . " Journal of Chromatography 8,666 (1995) 323–328.

Yamada et al. "Synthesis and isomerization of optical active . . . " Chem. Pharm. Bull. 42(8) (1994) 1679–1681.

K. Miwa et al. Jpn. Pharmacol. Ther. "Proton pump inhibitor in rats, mice and dogs" 18 (1990) 165–187 (transl).

H. Katsuki et al. "Determination of R(+)–and S(−)–Lansoprazole" Pharmaceutical Research 13(4) (1996) 611–615.

M. Tanaka et al. "Direct determination of pantoprazole enantiomers . . . " Anal. Chem. 68 (1996) 1513–1516.

P. Lindberg et al. "Omeprazole: The first proton pump inhibitor" Medicinal Res. Rev. 10 (1990) 2–50.

P. Lindberg et al. "The mechanism of action of . . . omeprazole" Journal of Medicinal Chemistry 29 (1986) 1327.

A. Brandstrom "Chemical reactions . . . " Reprint from Acta Chemica Scandinavica 43 (1989) 536–611.

K. Sigrist–Nelson et al. "Ro 18–5364, a potent inhibitor of the gastric (H$^+$ +K$^+$)–ATPase" Eur. J. Bioch. 166 (1987) 453.

Polomomcoll et al. CA 117;90292, 1992.

*Primary Examiner*—Jane Fan
*Attorney, Agent, or Firm*—White & Case

[57] **ABSTRACT**

The novel optically pure compounds Na$^+$, Mg$^{2+}$, Li$^+$, K$^+$, Ca$^{2+}$ and N$^+$(R)$_4$ salts of (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole or (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole, in particular sodium and magnesium salt form thereof, where R is an alkyl with 1–4 carbon atoms, processes for the preparation thereof and pharmaceutical preparations containing the compounds as active ingredients, as well as the use of the compounds in pharmaceutical preparations and intermediates obtained by preparing the compounds.

**10 Claims, No Drawings**

5,714,504

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## COMPOSITIONS

This application is a continuation-in-part of application Ser. No. 08/256,174, filed as PCT/SE94/00509, May 27, 1994.

### FIELD OF THE INVENTION

The present invention is directed to new compounds of high optical purity and crystalline salts thereof, their use in medicine, a process for their preparation and their use in the manufacture of pharmaceutical preparation. The invention also relates to novel intermediates in the preparation of the compounds of the invention.

### BACKGROUND OF THE INVENTION

The compound 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole, having the generic name omeprazole, and therapeutically acceptable alkaline salts thereof are described in U.S. Pat. No. 4,255, 431 to Junggren et al., EP 5129 and EP 124 495, respectively. Omeprazole and its alkaline salts are effective gastric acid secretion inhibitors, and are useful as antiulcer agents. The compounds, being sulfoxides, have an asymmetric center in the sulfur atom, i.e. exist as two optical isomers (enantiomers).

The separation of the enantiomers of omeprazole in analytical scale is described e.g. J. Chromatography, 532 (1990), 305–19 and in a preparative scale in DE 4035455. The latter has been done by using a diastereomeric ether which is separated and thereafter hydrolysed in an acidic solution. Under the acidic conditions needed for hydrolysis of the attached group, omeprazole is quite sensitive and the acid has to be quickly neutralized with a base to avoid degradation of the acid-sensitive compound. In the above mentioned application (DE 4035455) this is done by adding the reaction mixture containing concentrated sulfuric acid to a concentrated solution of NaOH. This is disadvantageous because them is a great risk of locally reaching pH values between 1–6, which would be devastating for the substance. Moreover, instantaneous neutralization will create heat which will be difficult to handle in large scale production.

There is no example in the known prior art of any isolated or characterized salt of optically pure omeprazole, i.e. of single enantiomers of omeprazole or of any isolated or characterized salt of any optically pure omeprazole analogue.

### SUMMARY OF THE INVENTION

It is desirable to obtain compounds with improved pharmacokinetic and metabolic properties which will give an improved therapeutic profile such as a lower degree of interindividual variation. The present invention provides such compounds, which are novel salts of single enantiomers of omeprazole.

A preferred embodiment of the present invention provides pure crystalline enantiomeric salts of omeprazole and methods for the preparation thereof.

A more preferred embodiment of the present invention is directed to an optically pure crystalline enantiomeric magnesium salt of omeprazole and method for the preparation thereof.

A nonaqueous process according to the present invention is directed to the preparation of crystalline forms of an optically pure enantiomer of omeprazole magnesium salt or analogues thereof which includes steps of stirring a crude

preparation of the omeprazole enantiomer under nitrogen into a methanolic magnesium methoxide solution, precipitating inorganic magnesium salt with addition of a small amount of water, removing any precipitated inorganic magnesium salts, concentrating the residual methanolic solution, precipitating the omeprazole enantiomer by adding acetone to the residual solution, and filtering off the optically pure enantiomer crystals of magnesium omeprazole or analogues thereof.

The present invention in a further aspect provides a novel method for preparing the novel compounds of the invention in large scale. This novel method can also be used in large scale to obtain single enantiomers of omeprazole in neutral form.

The compounds according to the invention may be used for inhibiting gastric acid secretion in mammals and man. In a more general sense, the compounds of the invention may be used for the treatment of gastric acid-related diseases and gastrointestinal inflammatory diseases in mammals and man, such as gastric ulcer, duodenal ulcer, reflux esophagitis, and gastritis. Furthermore, the compounds may be used for treatment of other gastrointestinal disorders where gastric antisecretory effect is desirable e.g. in patients on NSAID therapy, in patients with gastrinomas, and in patients with acute upper gastrointestinal bleeding. They may also be used in patients in intensive care situations, and pre- and postoperatively to prevent acid aspiration and stress ulceration. The compound of the invention may also be used for treatment or prophylaxis of inflammatory conditions in mammals, including man, especially those involving lysozymal enzymes. Conditions that may be specifically mentioned for treatment are rheumatoid arthritis and gout. The compound of the invention may also be useful in the treatment of psoriasis as well as in the treatment of Helicobacter infections.

### DETAILED DESCRIPTION OF THE INVENTION

The present invention refers to the new $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$ salts of the single enantiomers of omeprazole, where R is an alkyl with 1–4 carbon atoms, i.e. $Na^+$, $Mg^{2+}$, $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$ salts of (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole and (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole, where R is an alkyl with 1–4 carbon atoms.

Particularly preferred salts according to the invention are the $Na^+$, $Ca^{2+}$ and $Mg^{2+}$ salts, i.e (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole sodium salt, (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole sodium salt, (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole magnesium salt, (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole magnesium salt, (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole calcium salt and (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole calcium salt.

Most preferred salts according to the invention are the optically pure $Na^+$ salts of omeprazole according to compounds Ia and Ib

5,714,504

3             4



(Ia, Ib)

Nat

Ia (+)-enantiomer
Ib (−)-enantiomer

and the optically pure magnesium salts of omeprazole according to compounds IIa and IIb



(IIa, IIb)

IIa (+)-enantiomer
IIb (−)-enantiomer

With the expression "optically pure Na⁺ salts of omeprazole" is meant the (+)-enantiomer of omeprazole Na-salt essentially free of the (−)-enantiomer of omeprazole Na-salt and the (−)-enantiomer essentially free of the (+)-enantiomer, respectively. Single enantiomers of omeprazole have hitherto only been obtained as syrups and not as crystalline products. The salts defined by the present invention are easy to obtain by means of the novel specific method according to one aspect of the invention of preparing the single enantiomers of omeprazole. In contrast to the neutral forms the salts can be obtained as crystalline products. Because it is possible to purify optically impure or partially pure salts of the enantiomers of omeprazole by crystallization, they can be obtained in very high optical purity, namely ≧99.8% enantiomeric excess (e.e.) even from an optically contaminated preparation. Moreover, the optically pure salts are stable resisting racemization both in neutral pH and basic pH, which is surprising since the known deprotonation at the carbon atom between the pyridine ring and the chiral sulfur atom was expected to cause racemization under alkaline conditions. This high stability against racemization makes it possible to use a single enantiomeric salt of the invention in therapy.

The specific method of preparation of the single enantiomers of omeprazole is a further aspect of the invention as mentioned above and it can be used to obtain the single enantiomers of omeprazole in neutral form as well as the salts thereof.

Yet a further aspect of the invention is the compound III, which is an intermediate used in the specific method of preparation.



(III)

Preparation

The optically pure compounds of the invention, i.e. the single enantiomers, are prepared by separating the two stereoisomers of a diastereomeric mixture of the following type, 5- or 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1-[acyloxymethyl]-1H-benzimidazole, formula IV



(IV)

wherein the methoxy substituent in the benzimidazole moiety is in position 5 or 6, and wherein the Acyl radical is as defined below, followed by a solvolysis of each separated diastereomer in an alkaline solution. The formed single enantiomers of omeprazole are then isolated by neutralizing aqueous solutions of the salts of the single enantiomers of omeprazole with a neutralizing agent which can be an acid or an ester such as methyl formate.

The Acyl moiety in the diastereomeric ester may be a chiral acyl group such as mandeloyl, and the asymmetric center in the chiral acyl group can have either R or S configuration.

The diastereomeric esters can be separated either by chromatography or fractional crystallization.

The solvolysis usually takes place together with a base in a protic solvent such as alcohols or water, but the acyl group may also be hydrolyzed off by a base in an aprotic solvent such as dimethylsulfoxide or dimethylformamide. The reacting base may be OH⁻ or R¹O⁻ where R¹ can be any alkyl or aryl group.

To obtain the optically pure Na⁺ salts of the invention, i.e. the single enantiomers of omeprazole Na⁺ salts, the resulting compound is treated with a base, such as NaOH, in an aqueous or nonaqueous medium, or with NaOR² wherein R² is an alkyl group containing 1–4 carbon atoms, or with NaNH₂. In addition, alkaline salts wherein the cation is Li⁺ or K⁺ may be prepared using lithium or potassium salts of the above mentioned bases. In order to obtain the crystalline form of the Na⁺ salt, addition of NaOH in a non-aqueous medium such as a mixture of 2-butanone and toluene, is preferred.

To obtain the optically pure Mg²⁺ salts of the invention, the optically pure enantiomeric Na⁺ salts may be treated with an aqueous solution of an inorganic magnesium salt such as MgCl₂, whereupon the Mg²⁺ salts are precipitated. The optically pure Mg²⁺ salts may also be prepared by treating single enantiomers of omeprazole with a base, such as

5,714,504

5

$Mg(OR^3)_2$, wherein $R^3$ is an alkyl group containing 1–4 carbon atoms, in a non-aqueous solvent such as alcohol (only for alcoholates), e.g. ROH, or in an ether such as tetrahydrofuran. In an analogous way, also alkaline salts wherein the cation is $Ca^{2+}$ can be prepared, using an aqueous solution of an inorganic calcium salt such as $CaCl_2$.

Alkaline salts of the single enantiomers of the invention are, as mentioned above, the sodium salts (compounds Ia and Ib) and the magnesium salts (compounds IIa and IIb), exemplified by their salts with $Li^+$, $K^+$, $Ca^{2+}$ and $N^+(R)_4$, where R is an alkyl with 1–4 C-atoms.

For clinical use the single enantiomers, i.e. the optically pure compounds, of the invention are formulated into pharmaceutical formulations for oral, rectal, parenteral or other modes of administrations. The pharmaceutical formulations contain the single enantiomers of the invention normally in combination with a pharmaceutically acceptable carrier. The carrier may be in form of a solid, semi-solid or liquid diluent, or capsule. These pharmaceutical preparations are a further object of the invention. Usually the amount of active compound is between 0.1–95% by weight of the preparation, between 0.2–20% by weight in preparations for parenteral use and between 1–50% by weight in preparations for oral administration.

In the preparation of pharmaceutical formulations in form of dosage units for oral administration the optically pure compound may be mixed with a solid, powdered carrier, such as lactose, saccharose, sorbitol, mannitol, starch, amylopectin, cellulose derivates, gelatin or another suitable carrier, stabilizing substances such as alkaline compounds e.g. carbonates, hydroxides and oxides of sodium, potassium, calcium, magnesium and the like as well as with lubricating agents such as magnesium stearate, calcium stearate, sodium stearyl fumarate and polyethyleneglycol waxes. The mixture is then processed into granules or pressed into tablets. Granules and tablets may be coated with an enteric coating which protects the active compound from acid catalyzed degradation as long as the dosage form remains in the stomach. The enteric coating is chosen among pharmaceutically acceptable enteric-coating materials e.g. beeswax, shellac or anionic film-forming polymers and the like, if preferred in combination with a suitable plasticizer. To the coating various dyes may be added in order to distinguish among tablets or granules with different amounts of the active compound present.

Soft gelatine capsules may be prepared with capsules containing a mixture of the active compound, vegetable oil, fat, or other suitable vehicle for soft gelatine capsules. Soft gelatine capsules may also be enteric-coated as described above.

Hard gelatine capsules may contain granules or enteric-coated granules of the active compound. Hard gelatine capsules may also contain the active compound in combination with a solid powdered carrier such as lactose, saccharose, sorbitol, mannitol, potato starch, amylopectin, cellulose derivates or gelatin. The capsules may be enteric-coated as described above.

Dosage units for rectal administration may be prepared in the form of suppositories which contain the active substance mixed with a neutral fat base, or they may be prepared in the form of a gelatine rectal capsule which contains the active substance in a mixture with a vegetable oil, paraffin oil or other suitable vehicle for gelatine rectal capsules, or they may be prepared in the form of a ready-made micro enema, or they may be prepared in the form of a dry micro enema formulation to be reconstituted in a suitable solvent just prior to administration.

6

Liquid preparation for oral administration may be prepared in the form of syrups or suspensions, e.g. solutions or suspensions containing from 0.2% to 20% by weight of the active ingredient and the remainder consisting of sugar or sugar alcohols and a mixture of ethanol, water, glycerol, propylene glycol and/or polyethylene glycol. If desired, such liquid preparations may contain coloring agents, flavoring agents, saccharine and carboxymethyl cellulose or other thickening agents. Liquid preparations for oral administration may also be prepared in the form of dry powder to be reconstituted with a suitable solvent prior to use.

Solutions for parenteral administrations may be prepared as solutions of the optically pure compounds of the invention in pharmaceutically acceptable solvents, preferably in a concentration from 0.1 to 10% by weight. These solutions may also contain stabilizing agents and/or buffering agents and may be manufactured in different unit dose ampoules or vials. Solutions for parenteral administration may also be prepared as dry preparations to be reconstituted with a suitable solvent extemporaneously before use.

The typical daily dose of the active compound will depend on various factors such as for example the individual requirement of each patient, the route of administration and the disease. In general, oral and parenteral dosages will be in the range of 5 to 500 mg per day of active substance.

The invention is illustrated by the following examples using preferred procedures for the preparation of optically pure sodium salts and magnesium salts.

The processes described below for optically pure enantiomeric sodium salts of omeprazole result in change of directions from (−) to (+) optical rotation and, vice versa, from (+) to (−) optical rotation when preparing the sodium salt from the neutral form of omeprazole and again, when preparing the magnesium salt from the sodium salt of omeprazole.

### EXAMPLE 1

Preparation of (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole Sodium Salt

100 mg (0.3 mmol) of (−)-5-methoxy-2-[[(4-methoxy-3, 5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole (contaminated with 3% of the (+)-isomer) was dissolved in 1 ml of 2-butanone with stirring. 60 µl of an aqueous solution of 5.0M sodium hydroxide and 2 ml of toluene were added. The resultant mixture was non-homogeneous. In order to obtain a clear solution, more 2-butanone was added (ca 1 ml) and the mixture was stirred at ambient temperature over night. The formed precipitate was filtered off and washed with ether. There was obtained 51 mg (46%) of the title compound as whim crystals m.p. (decomposition) 246°–248° C. The optical purity (e.e.) which was analyzed by chiral column chromatography was ≧99.8%. $[\alpha]_D^{20}=+42.8°$ (concentration, c=0.5%, water).

NMR data are given below.

### EXAMPLE 2

Preparation of (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole Sodium Salt

100 mg-(0.3 mmol) of (+)-5-methoxy-2-[[(4-methoxy-3, 5-dimethyl-2-pyridinyl)-methyl]sulfinyl]-1H-benzimidazole (contaminated with 3% of the (−)-isomer) was dissolved in 1 ml of 2-butanone with stirring. 60 µl of

5,714,504

7

an aqueous solution of 5.0M sodium hydroxide and 2 ml of toluene were added. The resultant mixture was non-homogeneous. In order to obtain a clear solution, more 2-butanone was added (ca 1 ml) and the mixture was stirred at ambient temperature over night. The formed precipitate was filtered off and washed with ether. There was obtained 56 mg (51%) of the title compound as white crystals m.p. (decomposition) 247°–249° C. The optical purity (e.e.) which was analyzed by chiral column chromatography was $\geqq 99.8\%$. $[\alpha]_D^{20}=-44.1°$ (c=0.5%, water).

NMR data are given below.

### EXAMPLE 3

Preparation of (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole Magnesium Salt

2.9 ml of a 0.1M solution of NaOH was added to 0.10 g (0.29 mmol) (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole. To this mixture 2 ml methylene chloride was added, and after mixing in a separatory funnel the aqueous solution was separated off. A solution of 14 mg (0.145 mmol) $MgCl_2$ in water was added dropwise. The formed precipitate was isolated by centrifugation, and 52 mg (50%) of the product was isolated as an amorphous powder. The optical purity (e.e.) was 98%, and thus the same as the starting material. The optical purity was determined by chromatography on an analytical chiral column. $[\alpha]_D^{20}=+101.2°$ (c=1%, methanol). The Mg content of the sample was found to be 3.0%, shown by atomic absorption spectroscopy.

### EXAMPLE 4

Preparation of (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole Magnesium Salt

(−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole sodium salt (0.500 g, 1.36 mmol) was dissolved in water (10 ml). To this mixture 10 ml of an aqueous solution of $MgCl_2 \cdot xH_2O$ (138 mg, 0.68 mmol) was added dropwise and the formed precipitate was isolated by centrifugation. There was obtained 418 mg (86%) of the product as a white powder. The optical purity (ee) of the product was 99.8% which was the same as the optical purity of the starting material. The optical purity was determined by chromatography on an analytical chiral column. $[\alpha]_D^{20}=+129.9°$ (c=1%, methanol).

### EXAMPLE 5

Preparation of (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole Magnesium Salt

(+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-sulfinyl]-1H-benzimidazole sodium salt (0.165 g, 0.45 mmol) was dissolved in water (3 ml). To this mixture 2 ml of an aqueous solution of $MgCl_2 \cdot xH_2O$ (46 mg, 0.23 mmol) was added dropwise and the formed precipitate was isolated by centrifugation. There was obtained 85 mg (51%) of the product as a white powder. The optical purity (ee) of the product was 99.9% which was the same or better as the optical purity of the starting material. The optical purity was determined by chromatography on an analytical chiral column. $[\alpha]_D^{20}=-128.2°$ (c=1%, methanol).

8

#### TABLE 1

| Ex. | Solvent | NMR data δ ppm |
|---|---|---|
| 1. | DMSO-$d_6$ 500 MHz | 2.20 (s, 3H), 2.22 (s, 3H), 3.69 (s, 3H), 3.72 (s, 3H), 4.37 (d, 1H), 4.75 (d, 1H), 6.54 (dd, 1H), 6.96 (d, 1H) 7.30 (d, 1H), 8.21 (s, 1H). |
| 2. | DMSO-$d_6$ 500 MHz | 2.20 (s, 3H), 2.22 (s, 3H), 3.69 (s, 3H), 3.72 (s, 3H), 4.38 (d, 1H), 4.73 (d, 1H), 6.54 (dd, 1H), 6.96 (d, 1H), 7.31 (d, 1H), 8.21 (s, 1H). |

A preferred method for preparing optically pure omeprazole enantiomer crystal salts of magnesium is described in Examples 6 and 7.

### EXAMPLE 6

Enhancement of the Optical Purity by Preparing the Magnesium Salt of (−)-5-methoxy-2-[4-methoxy-3,5-dimethyl-2-pyridinyl)-methyl]sulfinyl]-1H-benzimidazole in Nonaqueous Solution Followed by Crystallization of Said Salt

Magnesium (0.11 g, 4.5 mmol) was dissolved and reacted with methanol (50 ml) at 40° C. with a catalytic amount of methylene chloride. The reaction was run under nitrogen and was finished after five hours. At room temperature a mixture of the two enantiomers [90% (−)-isomer and 10% (+)-isomer] of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole (2.84 g, 8.2 mmol) was added to the magnesium methoxide solution. The mixture was stirred for 12 hours whereupon a small amount of water (0.1 ml) was added in order to precipitate inorganic magnesium salts. After 30 minutes stirring, these inorganic salts were filtered off and the solution was concentrated on a rotavapor. The residue was now a concentrated methanolic solution of the enantiomeric mixture (i.e. the title compound contaminated with the (+)-isomer), with an optical purity (enantiomeric excess, e.e.) of 80%. This mixture was diluted with acetone (100 ml) and after stirring at room temperature for 15 minutes, a white precipitate was obtained. Additional stirring for 15 mintues and thereafter filtration afforded 1.3 g (50%) of the title compound as white crystals. Chiral analyses of the crystals and mother liquor were performed by chromatography on an analytical chiral column. The optical purity of the crystals and mother liquor was found to be 98.4 e.e. and 64.4% e.e., respectively. Thus, the optical purity (e.e.) has been enhanced from 80% to 98.4% simply by crystallizing the Mg-salt from a mixture of acetone and methanol. The product was crystalline as shown by powder X-ray diffraction and the magnesium content was 3.44% as shown by atomic absorption spectroscopy. $[\alpha]_D^{20}=-131.5°$ (c=0.5%, methanol).

### EXAMPLE 7

Enhancement of the Optical Purity by Preparing the Magnesium Salt of (+)-5-methoxy-2-[4-methoxy-3,5-dimethyl-2-pyridinyl)-methyl]sulfinyl]-1H-benzimidazole in Nonaqueous Solution Followed by Crystallization of Said Salt

Magnesium (0.11 g, 4.5 mmol) was dissolved and reacted with methanol (50 ml) at 40° C. with a catalytic amount of methylene chloride. The reaction was run under nitrogen and was finished after five hours. At room temperature a mixture of the two enantiomers [90% (+)-isomer and 10% (−)-isomer] of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole (2.84 g, 8.2

5,714,504

**9**

mmol) was added to the magnesium methoxide solution. The mixture was stirred for 12 hours whereupon a small amount of water (0.1 ml) was added in order to precipitate inorganic magnesium salts. After 30 minutes stirring, these inorganic salts were filtered off and the solution was concentrated on a rotavapor. The residue was now a concentrated methanolic solution of the enantiomeric mixture (i.e. the title compound contaminated with the (−)-isomer), with an optical purity (e.e.) of 80%. This mixture was diluted with acetone (100 ml) and after stirring at room temperature for one hour, a white precipitate was obtained. Additonal stirring for 30 minutes and thereafter filtration afforded 0.35 g of the title compound as white crystals. Additional stirring of the mother liquor for 24 hours at room temperature afforded another 1.0 g (total yield=52%). Chiral analyses of the crystals and the second mother liquor were performed by chromatography on an analytical chiral column. The optical purity the two crystal fractions was 98.8% e.e. and 99.5% e.e., respectively. The optical purity of the mother liquor was found to be 57% e.e. Thus, the optical purity (e.e.) has been enhanced from 80% to approximately 99% simply by crystallizing the Mg-salt from a mixture of acetone and methanol. The first precipitation was crystalline as shown by powder X-ray diffraction and the magnesium content of the same fraction was 3.49% as shown by atomic absorption spectroscopy. $[\alpha]_D^{20}=+135.6°$ (c=0.5%, methanol).

The crystalline salt according to Example 6 is most preferred.

Preparation of the synthetic intermediates according to the invention is described in the following examples.

### EXAMPLE 8

Preparation of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-sulfinyl]-1-(R)-mandeloyloxymethyl]-1H-benzimidazole

A solution of 3.4 g sodium hydroxide in 40 ml water was added to a mixture of 14.4 g (42 mmol) tetrabutylammonium hydrogen sulfate and 6.4 g (42 mmol) (R)-(−)-mandelic acid. The mixture was extracted with 400 ml chloroform. After separation, the organic extract was heated to reflux with 16.6 g (42 mmol) of the racemate of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-sulfinyl]-1-[chloromethyl]-1H-benzimidazole. Evaporation of the solvent was followed by dilution with 100 ml dichloromethane and 700 ml ethyl acetate. The mixture was washed with 3×200 ml water and the organic solution was dried over MgSO₄ and then evaporated. The crude material was purified by recrystallization from 100 ml acetonitrile, giving 8.1 g of the title compound (38%) as a diastereomeric mixture.

NMR data are given below.

### EXAMPLE 9

Separation of the More Hydrophilic Diastereomer of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-(R/S)-sulfinyl]-1[(R) mandeloyloxymethyl]-1H-benzimidazole

The diastereomers of the title compound in Example 8 were separated using reversed phase chromatography (HPLC). Approximately 300 mg of the diastereomeric mixture was dissolved in 10 ml hot acetonitrile which was diluted with 10 ml of a mixture of aqueous 0.1M ammoniumacetate and acetonitrile (70/30). The solution was injected to the column and the compounds were eluted with a mixture of aqueous 0.1M ammoniumacetate and acetoni-

**10**

trile (70/30). The more hydrophilic isomer was easier to obtain pure than the less hydrophilic one. The work up procedure for the fraction which contained pure isomer was as follows; extraction with dichloromethane, washing the organic solution with aqueous 5% sodium hydrogen carbonate solution, drying over Na₂SO₄ and evaporation of the solvent on a rotavapor (at the end of the evaporation the removal of acetonitrile was facilitated by adding more dichloromethane). Using 1.2 g of the diastereomeric mixture with the above mentioned technique, the more hydrophilic isomer, 410 mg, was obtained in a pure state as a colorless syrup.

NMR data are given below.

### EXAMPLE 10

Preparation of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-(R/S)-sulfinyl]-1-[(S)-mandeloyloxymethyl]-1H-benzimidazole

The product was obtained from 8.1 g (202 mmol) sodium hydroxide in 100 ml water, 34.4 g (101 mmol) tetrabutylammonium hydrogen sulfate, 15.4 g (101 mmol) (S)-(+)-mandelic acid and 39.9 g (101 mmol) of the racemate of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-sulfinyl]-1-[chloromethyl]-1H-benzimidazole using the same procedure as in Example 8. Recrystallization from 100 ml acetonitrile yielded 21.3 g, i.e. 41% of the title compound as a diastereomeric mixture.

NMR data are given below.

### EXAMPLE 11

Separation of the More Hydrophilic Diastereomer of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-(R/S)-sulfinyl]-1-[(S)-mandeloyloxymethyl]-1H-benzimidazole

The diastereomers of the title compound in Example 10 were separated using reversed phase chromatography (HPLC) in the same way as in Example 7, but using the diastereomeric mixture of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-(R/S)-sulfinyl]-1-[(S)-mandeloloxymethyl]-1H-benzimidazole instead of the (R)-mandelic ester used in Example 9. Using 2.1 g of the diastereomeric mixture, the more hydrophilic isomer, 760 mg, was obtained in a pure state as a colorless syrup.

NMR data are given below.

### EXAMPLE 12

Preparation of (−)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-sulfinyl]-1H-benzimidazole

0.23 g (0.45 mmol) of the more hydrophilic diastereomer of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1-[(R)-mandeloyloxymethyl]-1H-benzimidazole was dissolved in 15 ml methanol. A solution of 36 mg (0.9 mmol) sodium hydroxide in 0.45 ml water was added, and after 10 minutes the mixture was evaporated on a rotavapor. The residue was partitioned between 15 ml water and 15 ml dichloromethane. The organic solution was extracted with 15 ml water and to the combined aqueous solutions was added 85 µl (1.4 mmol) methyl formate. After 15 minutes the mixture was extracted with 3×10 ml dichloromethane. The organic solution was dried over Na₂SO₄ and then evaporated. There was obtained 0.12 g (77%) of the title compound as a colorless syrup. The optical purity (e.e.)

5,714,504

<table>
<tr><td>11</td><td>12</td></tr>
</table>

which was analyzed by chiral column chromatography was 94%. $[\alpha]_D^{20}=-155°$ (c=0.5% chloroform).

NMR data are given below

## EXAMPLE 13

Preparation of (+)-5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]-sulfinyl]-1H-benzimidazole

0.76 g (1.5 mmol) of the more hydrophilic diastereomer of 6-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1-[(S)-mandeloyloxymethyl]-1H-benzimidazole was dissolved in 50 ml methanol. A solution of 0.12 mg (3.0 mmol) sodium hydroxide in 1.5 ml water was added, and after 10 minutes the mixture was evaporated on a rotavapor. The residue was partitioned between 25 ml water and 25 ml dichloromethane. The organic solution was extracted with 25 ml water and to the combined aqueous solutions was added 200 µl (3.2 mmol) methyl formate. After 15 minutes the mixture was extracted with 3×25 ml dichloromethane. The organic solution was dried over $Na_2SO_4$ and then evaporated. There was obtained 0.42 g (81%) of the title compound as a colorless syrup. The optical purity (e.e.) which was analyzed by chiral column chromatography was 98%. $[\alpha]_D^{20}=+157°$ (c=0.5%, chloroform).

NMR data are given below

## TABLE 2

| Ex. | Solvent | NMR data δ ppm |
|-----|---------|----------------|
| 8. | CDCl₃ 500 MHz | 2.18 (s, 3H), 2.20 (s, 3H), 2.36 (s, 3H), 2.39 (s, 3H), 3.77 (s, 3H), 3.78 (s, 3H), 3.82 (s, 3H), 3.87 (s, 3H), 4.80 (d, 1H), 4.88 (d, 1H), 5.0 (m, 2H), 5.34 (s, 2H), 6.43 (d, 1H), 6.54 (d, 1H), 6.6–6.7 (m, 2H), 6.90 (d, 1H), 6.95–6.98 (m, 2H), 7.01 (d, 1H), 7.2–7.3 (m, 6H), 7.37 (m, 2H), 7.44 (m, 2H), 7.58 (d, 1H), 7.62 (d, 1H), 7.95 (s, 1H), 7.97 (s, 1H). |
| 9. | CDCl₃ 500 MHz | 2.20 (s, 3H), 2.36 (s, 3H), 3.78 (s, 3H), 3.82 (s, 3H), 4.80 (d, 1H), 5.00 (d, 1H), 5.35 (d, 1H), 6.43 (d, 1H), 6.63 (d, 1H), 6.90 (d, 1H), 6.97 (dd, 1H), 7.2–7.3 (m, 3H), 7.37 (m, 2H), 7.62 (d, 1H), 7.97 (s, 1H). |
| 10. | CDCl₃ 500 MHz | 2.19 (s, 3H), 2.20 (s, 3H), 2.36 (s, 3H), 2.39 (s, 3H), 3.77 (s, 3H), 3.78 (s, 3H), 3.83 (s, 3H), 3.87 (s, 3H), 4.80 (d, 1H), 4.88 (d, 1H), 5.0 (m, 2H), 5.34 (s, 2H), 6.43 (d, 1H), 6.54 (d, 1H), 6.6–6.7 (m, 2H), 6.90 (d, 1H), 6.96–6.98 (m, 2H), 7.01 (d, 1H), 7.2–7.3 (m, 6H), 7.37 (m, 2H), 7.44 (m, 2H), 7.58 (d, 1H), 7.62 (d, 1H), 7.95 (s, 1H), 7.97 (s, 1H). |
| 11. | CDCl₃ 500 MHz | 2.20 (s, 3H), 2.36 (s, 3H), 3.78 (s, 3H), 3.82 (s, 3H), 4.80 (d, 1H), 5.00 (d, 1H), 5.35 (d, 1H), 6.43 (d, 1H), 6.63 (d, 1H), 6.90 (d, 1H), 6.97 (dd, 1H), 7.2–7.3 (m, 3H), 7.37 (m, 2H), 7.62 (d, 1H), 7.97 (s, 1H). |
| 12. | CDCl₃ 300 MHz | 2.18, (s, 3H), 2.22 (s, 3H), 3.68 (s, 3H), 3.83 (s, 3H), 4.77 (m, 2H), 6.93 (dd, 1H), ≈7.0 (b, 1H), ≈7.5 (b, 1H), 8.19 (s, 1H). |
| 13. | CDCl₃ | 2.21 (s, 3H), 2.23 (s, 3H), 3.69 (s, 3H), 3.84 (s, 3H), 4.76 (m, 2H), 6.94 (dd, 1H), ≈7.0 (b, 1H), ≈7.5 (b, 1H), 8.20 (s, 1H). |

Pharmaceutical preparations containing the compounds of the invention as active ingredient are illustrated in the following formulations.

Syrup

A syrup containing 1% (weight per volume) of active substance was prepared from the following ingredients:

| | |
|---|---|
| Compound according to Example 1 | 1.0 g |
| Sugar, powder | 30.0 g |
| Saccharine | 0.6 g |

-continued

| | | |
|---|---|---|
| Glycerol | 5.0 | g |
| Flavoring agent | 0.05 | g |
| Ethanol 96% | 5.0 | g |
| Distilled water q.s. to a final volume of | 100 | ml |

Sugar and saccharine were dissolved in 60 g of warm water. After cooling the active compound was added to the sugar, solution and glycerol and a solution of flavoring agents dissolved in ethanol were added. The mixture was diluted with water to a final volume of 100 ml.

Enteric-coated Tablets

An enteric coated tablet containing 50 mg of active compound was prepared from the following ingredients:

| I | |
|---|---|
| Compound according to Example 6 as Mg salt | 500 g |
| Lactose | 700 g |
| Methyl cellulose | 6 g |
| Polyvinylpyrrolidone cross-linked | 50 g |
| Magnesium stearate | 15 g |
| Sodium carbonate | 6 g |
| Distilled water | q.s. |

| II | |
|---|---|
| Cellulose acetate phthalate | 200 g |
| Cetyl alcohol | 15 g |
| Isopropanol | 2000 g |
| Methylene chloride | 2000 g |

I Compound according to Example 6, powder, was mixed with lactose and granulated with a water solution of methyl cellulose and sodium carbonate. The wet mass was forced through a sieve and the granulate dried in an oven. After drying the granulate was mixed with polyvinylpyrrolidone and magnesium stearate. The dry mixture was pressed into tablet cores (10 000 tablets), each tablet containing 50 mg of active substance, in a tabletting machine using 7 mm diameter punches.

II A solution of cellulose acetate phthalate and cetyl alcohol in isopropanol/methylene chloride was sprayed onto the tablets I in an Accela Cota®. Manesty coating equipment. A final tablet weight of 110 mg was obtained.

Solution for Intravenous Administration

A parenteral formulation for intravenous use, containing 4 mg of active compound per ml, was prepared from the following ingredients:

| | | |
|---|---|---|
| Compound according to Example 2 | 4 | g |
| Sterile water to a final volume of | 1000 | ml |

The active compound was dissolved in water to a final volume of 1000 ml. The solution was filtered through a 0.22 µm filter and immediately dispensed into 10 ml sterile ampoules. The ampoules were sealed.

Capsules

Capsules containing 30 mg of active compound were prepared from the following ingredients:

| | |
|---|---|
| Compound according to Example 6 | 300 g |
| Lactose | 700 g |
| Microcrystalline cellulose | 40 g |
| Hydroxypropyl cellulose low-substituted | 62 g |
| Disodium hydrogen phosphate | 2 g |
| Purified water | q.s. |

The active compound was mixed with the dry ingredients and granulated with a solution of disodium hydrogen phos-

5,714,504

13

phate. The wet mass was forced through an extruder and spheronized and dried in a fluidized bed dryer.

500 g of the pellets above were first coated with a solution of hydroxypropyl methylcellulose, 30 g, in water, 750 g, using a fluidized bed coater. After drying, the pellets were coated with a second coating as given below:

| Coating solution: | |
|---|---|
| Hydroxypropyl methylcellulose phthalate | 70 g |
| Cetyl alcohol | 4 g |
| Acetone | 200 g |
| Ethanol | 600 g |

The final coated pellets were filled into capsules.
Suppositories

Suppositories were prepared from the following ingredients using a welding procedure. Each suppository contained 40 mg of active compound.

| Compound according to Example 1 | 4 g |
|---|---|
| Witepsol H-15 | 180 g |

The active compound was homogenously mixed with Witepsol H-15 at a temperature of 41° C. The molten mass was volume filled into pre-fabricated suppository packages to a net weight of 1.84 g. After cooling the packages were heat sealed. Each suppository contained 40 mg of active compound.
Stability Towards Racemization at Different pH Values

The stability of the optically pure compounds of the invention against racemization has been measured at low concentrations in a refrigerator in aqueous buffer solutions at pH 8, 9.3, 10 and 11.2. The stereochemical stability was measured by comparing the optical purity for the (−)-isomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)-methyl]sulfinyl]-1H-benzimidazole in buffer solution immediately after dissolving and after several days. The measurement was performed by chromatography on an analytical chiral column. The surprising high stereochemical stability in alkaline conditions for the compounds of invention is exemplified by the fact that no racemization for the test compound was obtained at pH 11.2 even after 21 days. At pH 8, 9.3 and 10, the chemical degradation of the compound is more apparent which makes the racemization measurement more difficult to perform, however at none of these pH values a detectable racemization was obtained after 16 days.

In another racemization experiment with the optically pure compounds of the invention, an aqueous phosphate buffer solution (pH=11) of the (+)-isomer of 5-methoxy-2-

14

[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole sodium salt (c=10⁻⁵M) was warmed for 26 hours at 37° C. without any racemization at all being observed.

What is claimed is:

1. A pharmaceutical formulation for oral administration comprising a pure solid state alkaline salt of the (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole and a pharmaceutically acceptable carrier.

2. The pharmaceutical formulation according to claim 1 wherein the solid state salt is optically pure.

3. The pharmaceutical formulation according to claim 1, wherein the alkaline salt is a Na⁺, Mg²⁺, Li⁺, K⁺, Ca²⁺ or N⁺(R)₄ salt.

4. The pharmaceutical formulation according to claim 1, wherein the solid state salt is in substantially crystalline form.

5. The pharmaceutical formulation according to claim 1 wherein the alkaline salt is a sodium or magnesium salt.

6. A method of inhibiting gastric acid secretion comprising the oral administration of a pharmaceutical formulation comprising a therapeutically effective amount of a pure solid state alkaline salt of the (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole and a pharmaceutically acceptable carrier.

7. A method for the treatment of gastrointestinal inflammatory disease comprising the oral administration to a mammal including man in need of such treatment of a pharmaceutical formulation comprising a therapeutically effective amount of a pure solid state alkaline salt of the (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole and a pharmaceutically acceptable carrier.

8. A method for the treatment of gastrointestinal inflammatory diseases comprising the oral administration to a mammal including man in need of such treatment a composition comprising an effective amount of the pure (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole and a pharmaceutically acceptable carrier.

9. A method of inhibiting gastric acid secretion comprising the oral administration of a pharmaceutical composition comprising an effective amount of the pure (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole and a pharmaceutically acceptable carrier.

10. The method of claim 6 or 7 wherein the alkaline salt is a Na⁺, Mg²⁺, Li⁺, K⁺, Ca²⁺ or N⁺(R)₄ salt.

* * * * *



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS; SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

May 13, 2011

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,877,192*
ISSUE DATE: *March 02, 1999*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. SWAIN
Certifying Officer

HAN0038826

**A34**

US005877192A

# United States Patent [19]

## Lindberg et al.

[11] **Patent Number:** **5,877,192**

[45] **Date of Patent:** ***Mar. 2, 1999**

[54] **METHOD FOR THE TREATMENT OF GASTRIC ACID-RELATED DISEASES AND PRODUCTION OF MEDICATION USING (-) ENANTIOMER OF OMEPRAZOLE**

[75] Inventors: **Per Lindberg**, Mölndal; **Lars Weidolf**, Västra Frölunda, both of Sweden

[73] Assignee: **Astra Aktiebolag**, Sodertalje, Sweden

[ * ] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,714,504.

[21] Appl. No.: **833,962**

[22] Filed: **Apr. 11, 1997**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 376,512, Jan. 23, 1995, Pat. No. 5,714,504, which is a continuation-in-part of Ser. No. 256,174, Jun. 28, 1994, Pat. No. 5,693,818.

[30] **Foreign Application Priority Data**

May 28, 1993 [SE] Sweden ................................. 9301830
Apr. 11, 1996 [SE] Sweden ................................. 9601383

[51] Int. Cl.$^6$ .................................................... A61K 31/44

[52] U.S. Cl. ........................... **514/338**; 514/819; 514/927

[58] Field of Search ..................................... 514/338, 819, 514/927

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

5,714,504 2/1998 Linberg et al. ......................... 514/338

*Primary Examiner*—Kimberly Jordan
*Attorney, Agent, or Firm*—White & Case LLP

[57] **ABSTRACT**

A method for treatment of gastric acid related diseases by inhibition of gastric acid secretion comprising administering to a mammal in need of treatment a therapeutically effective amount of the (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole or a pharmaceutically acceptable salt thereof, so as to effect decreased interindividual variation in plasma levels upon administration. The use of the (−)-enantiomer of omeprazole to receive increased average plasma levels (AUC) upon administration of the same doses of the (−)-enantiomer of omeprazole compared to those of racemic omeprazole is also claimed, as well as an improved anti-secretory effect and a better clinical effect.

**23 Claims, 3 Drawing Sheets**



FIG. I



FIG. 2



FIG.3A

Mean plasma concentration (day 7)

| AUC slow/AUC rapid | | |
|---|---|---|
| (±)-omeprazole | (−)-omeprazole | (+)-omeprazole |
| 10 | 3 | 30 |

AUC:area under the plasma concentration vs. time curve



FIG.3B

5,877,192

| 1 | 2 |

## METHOD FOR THE TREATMENT OF GASTRIC ACID-RELATED DISEASES AND PRODUCTION OF MEDICATION USING (-) ENANTIOMER OF OMEPRAZOLE

This application is a continuation-in-part of Ser. No. 08/376,512 filed on Jan. 23, 1995 now U.S. Pat. No. 5,714,504, which is a continuation-in-part of Ser. No. 08/256,174 filed Jun. 28, 1994, now U.S. Pat. No. 5,693,818.

The description of the salt forms of the single enantiomers of omeprazole and the process of making the same is herein incorporated by reference to copending Ser. No. 08/376,512.

### FIELD OF THE INVENTION

The present invention is related to the use of one of the single enantiomers of omeprazole, i.e. the (–)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)-methyl]sulfinyl]-1H-benzimidazole or a pharmaceutically acceptable salt thereof, in the treatment of gastric acid related diseases. The expression single enantiomer refers to the fact that the (–)-enantiomer is substantially free from its (+)-enantiomeric contaminant.

### BACKGROUND OF THE INVENTION

The compound 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole, having the generic name omeprazole, and therapeutically acceptable salts thereof, are described in EP 5129. The specific alkaline salts of omeprazole are described in EP 124 495. Omeprazole is effective as a gastric acid secretion inhibitor, and is useful as an antiulcer agent. In a more general sense, omeprazole may be used for prevention and treatment of gastric-acid related diseases in mammals and especially in man, including e.g. reflux esophagitis, gastritis, duodenitis, gastric ulcer and duodenal ulcer. Furthermore, omeprazole may be used for treatment of other gastrointestinal disorders where gastric acid inhibitory effect is desirable e.g. in patients on NSAID therapy, in patients with Non Ulcer Dyspepsia, in patients with symptomatic gastro-esophageal reflux disease (GERD), and in patients with gastrinomas. Omeprazole may also be used in patients in intensive care situations, in patients with acute upper gastrointestinal bleeding, pre-and postoperatively to prevent aspiration of gastric acid and to prevent and treat stress ulceration. Further, omeprazole may be useful in the treatment of psoriasis as well as in the treatment of Helicobacter infections and diseases related to these.

Omeprazole is a sulfoxide and a chiral compound, wherein the sulfur atom being the stereogenic center. Thus, omeprazole is a racemic mixture of its two single enantiomers, the (+)-enantiomer of omeprazole and the (–)-enantiomer of omeprazole. The absolute configurations of the enantiomers of omeprazole have been determined by an X-ray study of an N-alkylated derivative of the (+)-enantiomer in neutral form. The (+)-enantiomer of the neutral form and the (–)-enantiomer of the neutral form were found to have the R and S configuration, respectively. The conditions for the optical rotation measurement for each of the compounds mentioned above are described in WO 94/27988.

Different salts of the single enantiomers of omeprazole are also described in WO 94/27988. Specific processes for the preparation of the single enantiomers of substituted benzimidazoles are described in WO 96/02535. An oral pharmaceutical dosage form of omeprazole or one of its single enantiomers is described in WO 96/01623. Other oral dosage forms for the (–)-enantiomer of omeprazole can be found in EP 247 983.

There are few studies on the single enantiomers of omeprazole. One previous in vitro study on inhibition of acid secretion in isolated gastric glands showed no significant difference in effect between the two single enantiomers of omeprazole and the racemic mixture, see Erlandsson P. et al, Journal of Chromatography 1990; 532: 305–319. It has also been shown that, when omeprazole was administered intravenously to one subject, the plasma levels of the two enantiomers were similar, see Cairns A. M. et al, Journal of Chromatography B, 1995; 666: 323–328.

More than 135 million prescriptions by doctors indicate that omeprazole is an effective and safe drug. Notwithstanding, omeprazole exhibits polymorphic metabolism, i.e. a few individuals (3% among the Caucasian populations and 15–20% among Orientals) metabolise omeprazole slowly (slow metabolisers) compared to the rest of the population (rapid metabolisers). Slow metabolisers of omeprazole will obtain higher than the average plasma concentrations of the drug. Since the inhibition of gastric acid secretion is correlated to the area under the plasma concentration versus time curve (AUC), a more pronounced effect from omeprazole is expected in these slow metabolising individuals. A less interindividual variation, i.e. especially slow versus rapid metabolisers, and on the average higher plasma levels, giving higher dose efficiency in patients, could be of therapeutic benefit. Thus, one of the enantiomers of omeprazole, referred to as the (–)-enantiomer of omeprazole, or a pharmaceutically acceptable salt thereof, is hereby claimed to be an improved alternative to omeprazole in the treatment of gastric acid related diseases resulting in higher dose efficiency and in less interindividual variation in plasma levels (AUC), both between rapid and slow metabolisers and within the group of rapid metabolisers.

### SUMMARY OF THE INVENTION

The use of the (–)-enantiomer of omeprazole, or a pharmaceutically acceptable salt thereof, in the treatment of gastric acid related diseases as a mean to decrease interindividual variation in plasma levels compared to omeprazole is claimed. The use of the (–)-enantiomer of omeprazole to receive increased average plasma levels (AUC) of the substance compared to those of racemic omeprazole and thereby a higher dose efficiency is also claimed.

### DETAILED DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the mean plasma levels of racemic omeprazole and the (–)-enantiomer of omeprazole at steady state (Day 7) in rapid metabolisers following administration of 15 mg doses of each substance.

FIG. 2 shows the mean plasma levels of racemic omeprazole and the (–)-enantiomer of omeprazole at steady state (Day 7) in slow metabolisers following administration of 60 mg doses of each substance.

FIGS. 3a and 3b show the mean plasma levels of racemic omeprazole, the single (–)-enantiomer of omeprazole and the single (+)-enantiomer of omeprazole at steady state in rapid and slow metabolisers following administration of 15 mg and 60 mg doses of each substance, respectively. The figure sheet also comprises the ratios between the mean AUCs at steady state of slow and rapid metabolisers.

### DETAILED DESCRIPTION OF THE INVENTION

Omeprazole is metabolised mainly in the liver by the cytochrome P450 system (CYP). Metabolism can be defined

5,877,192

3

as the property of the body to transform lipophilic compounds into hydrophilic derivatives, which more easily can be excreted from the body. The metabolism can generally be divided into phase I and phase II reactions. During a phase I reaction, polar groups are formed via oxidation, hydroxylation, or hydrolysis. These reactions are mainly associated with the CYP enzymes. Phase II reactions are conjugation reactions, in which even further hydrophilic moities are attached to the drug or to its metabolites.

CYP is a superfamily of enzymes. Each family consists of one or more subfamilies and each subfamily contains one or more specific CYP isoforms. Apart from metabolising drugs, the CYP isoforms also have the property to metabolise endogenous compounds, such as steroids, fatty acids, and prostaglandins.

With respect to drug metabolism in man, three families, CYP1, CYP2, and CYP3 or, more specifically, six different CYP isoforms within these families are of particular importance. Each isoform demonstrates a certain substrate specificity. The expression of these enzymes is under genetic control, which is one of the reasons for the interindividual variation in rate and extent of metabolism demonstrated for most drugs. Moreover, at least two of the CYP isoforms, CYP2C19 and CYP2D6, are polymorphically expressed. Thus, a few individuals among the population, i.e. the slow metabolisers, lack or express a mutated form of the relevant CYP isoform, and consequently metabolise substrates for this isoform slowly. Metabolism still occurs in these slow metabolisers, although at a lower rate, because it is switched to other CYP isoforms which are less important for the metabolism of the substrate in the rest of the population.

Omeprazole is known to be a substrate for the polymorphically expressed CYP2C19. In vitro studies in human liver microsomes have surprisingly indicated that the (–)-enantiomer of omeprazole is less metabolised by CYP2C19 than omeprazole. In agreement with this, it has also been found, according to the present invention, that administration of the (–)-enantiomer of omeprazole or an acceptable therapeutical salt thereof results in a less pronounced difference in plasma levels between slow and rapid metabolisers.

Some studies have been published indicating that slow metabolisers, with higher than average plasma concentrations of omeprazole, are more prone to develop hypergastrinemia (Chang M. et al. Br J Clin Pharmacol 995; 39: 511–518, Caraco Y. et al. Clin Pharmacol Ther 1996; 59, 2: 216) as well as to slightly induce the levels of CYP1A2 (Rost KL et al. Clin Pharmacol Ther 1992; 52: 170–180, Rost KL et al. Clin Pharmacol Ther 1994; 55: 402–411), a CYP isoform distinct from CYP2C19. Some authors have therefore suggested that there might be a need for dosage adjustment in these individuals. The use of the (–)-enantiomer of omeprazole would decrease the potential for CYP1A2 induction in slow metabolisers as a result of the lower plasma levels (AUC) of this compound obtained in these individuals. Since the gastrin levels obtained simply are a result of a natural feedback mechanism determined by the degree of inhibition of gastric acid secretion, the use of the (–)-enantiomer of omeprazole may also potentially result in a less pronounced increase in gastrin in slow metabolisers.

The clinical study reported below supports the claimed invention and discusses the results more in detail.

The (–)-enantiomer of omeprazole is effective as a gastric acid secretion inhibitor, and is useful as an antiulcer agent. In a more general sense, the (–)-enantiomer of omeprazole can be used for prevention and treatment of the same

4

gastric-acid related diseases in mammals and especially in man as omeprazole, see above.

Any suitable route of administration may be employed for providing the patient with an effective dosage of the (–)-enantiomer of omeprazole. For example, oral, parenteral, subcutaneous, intramuscular, rectal, transdermal and the like may be employed. Dosage forms include capsules, tablets, dispersions, suspensions, solutions and the like.

The pharmaceutical compositions of the present invention comprise the (–)-enantiomer of omeprazole as active ingredient, or a pharmaceutically acceptable salt thereof, and may also contain a pharmaceutically acceptable carrier and optionally other therapeutic ingredients. The term "pharmaceutically acceptable salt" refers to both acid and alkaline pharmaceutically acceptable non-toxic salts. Compositions comprising other therapeutic ingredients are especially of interest in the treatment of Helicobacter infections.

The compositions include compositions suitable for oral, rectal or parenteral such as subcutaneous, intramuscular, and intravenous administration. The most preferred route of the present invention is the oral route. The compositions may be conveniently presented in unit dosage forms, and prepared by any methods well known in the art of pharmacy.

The most suitable route of administration as well as the magnitude of a therapeutic dose of the (–)-enantiomer of omeprazole or a pharmaceutically acceptable salt thereof in any given case will depend on the nature and severity of the disease to be treated. The dose, and dose frequency, may also vary according to the age, body weight, and response of the individual patient. Special requirements may be needed for patients having Zollinger-Ellison syndrome, such as a need for higher doses than the average patient. Children and patients with liver diseases generally will benefit from doses that are somewhat lower than the average. Thus, in some conditions it may be necessary to use doses outside the ranges stated below. Such higher and lower doses of the (–)-enantiomer of omeprazole are within the scope of the present invention.

In general, a suitable oral dosage form may cover a dose range from 5 mg to 80 mg total daily dose, administered in one single dose or equally divided doses. A preferred dose range is from 20 mg to 60 mg total daily dose. For a parenteral dosage form the same dose ranges may apply.

The (–)-enantiomer of omeprazole may be combined as the active component in intimate admixture with a pharmaceutical carrier according to conventional techniques, such as the oral formulations described in WO 96/01623 and EP 247 983, the disclosures of which are hereby incorporated in a whole by reference.

Different routes of preparation of the (–)-enantiomer of omeprazole and pharmaceutically acceptable salts thereof are described in WO 94/27988 and WO 96/02535, the disclosures of which are hereby incorporated in a whole by reference.

The invention is further defined by reference to the following experimental work describing in detail the study and results as well as the clinical relevance of the findings.

EXPERIMENTAL STUDY

Methods:

In an open, randomised, three way cross-over designed study, consisting of three treatment periods, each with a duration of 7 days and each separated by a washout period of two weeks, the sodium salt of the (–)-enantiomer of omeprazole, the sodium salt of the (+)-enantiomer of ome-

5,877,192

| 5 | 6 |

prazole and omeprazole sodium salt were investigated. Nine healthy subjects, classified according to the urinary S/R mephenytoin ratio as five slow metabolisers and four rapid metabolisers of omeprazole, completed the study (Sanz E. J et al, Clin Pharmacol Ther 1989; 45:495–499).

In slow metabolisers 60 mg doses of each compound were given once daily, while the rapid metabolisers were given once daily doses of 15 mg. The pharmacokinetics were studied in all subjects on days 1 and 7. The reason for using different doses was to optimise the conditions to explore the secondary aims of the study, to measure the effect on gastric acid secretion in rapid metabolisers and to measure the potential effect on caffeine metabolism in slow metabolisers.

Results and discussion:

In rapid metabolisers the mean AUC at steady state (Day 7) of the (−)-enantiomer of omeprazole was almost 90% higher than that of omeprazole. (FIG. 1). This resulted in a more pronounced gastric acid antisecretory effect for the (−)-enantiomer of omeprazole compared to that of omeprazole. The inhibition of pentagastrin stimulated gastric acid secretion was 62% for omeprazole and 79% for the (−)-enantiomer of omeprazole following administration of 15 mg doses of each substance.

In slow metabolisers the mean AUC at steady state (Day 7) of the (−)-enantiomer of omeprazole was about 30% lower than that of omeprazole. (FIG. 2). Thus, after correction for different dose levels, the resulting difference in AUC between slow and rapid metabolisers was almost 10-fold for omeprazole and only 3-fold for the (−)-enantiomer of omeprazole. With the (+)-enantiomer of omeprazole, on the other hand, the difference in AUC was much greater, approximately 30-fold (FIG. 3).

In conclusion, the interindividual variation in plasma levels upon administration of the (−)-enantiomer of omeprazole will be less than for omeprazole and more patients will get optimal plasma concentrations with respect to gastric acid antisecretory effect and potentially also a better clinical effect following administration of the same doses.

Another study was conducted in 38 patients with symptomatic gastroesophageal reflux disease in which the effects on 24 hour intragastric acidity by oral treatment with 20 mg omeprazole racemate (capsules) and the magnesium salt of (−)-omeprazole (corresponding to 20 mg or 40 mg of the neutral compound) were compared. In addition, the plasma concentrations of (−)-omeprazole and omeprazole racemate were determined on the last treatment day (day 5).

The study was conducted as a double-blind, randomized, three-way cross-over trial consisting of three study periods, each with five days of daily oral administration of formulations containing the magnesium salt of (−)-omeprazole or omeprazole racemate separated by a wash-out period of at least two weeks. The 38 patients (22 females) ranged in age from 29–58 years. 32 of the patients were *Helicobacter pylori* negative.

Enteric coated pellets comprising the magnesium salt of (−)-omeprazole were filled in hard gelatin capsules calculated to correspond to either 20 mg or 40 mg of neutral (−)-omeprazole compound.

These formulations were compared with an identical treatment except for using enteric coated pellets comprising omeprazole filled in a hard gelatin capsule containing 20 mg racemic omeprazole in the non-salt form (Prilosec®).

The intragastric pH was recorded over 24 hours on day five of each study period upon administering the fifth dose.

The study was completed by 36 patients and the results therefrom were statistically evaluated. The effects of the

treatments on intragastric pH are summarized in Table 1 and the AUC values are shown in Table 2.

As shown in Table 1 the percentage of time (of the 24-hour period assessed) with pH above 4 (a direct measure of inhibitory effect on gastric acid secretion) was 44% for 20 mg omeprazole racemate and 53% for 20 mg (−)-omeprazole (p<0.0001), which means that patients treated with (−)-omeprazole will have 2.2 hours longer time with pH above 4 than those treated with omeprazole racemate in corresponding doses.

TABLE 1

| Least square estimates and 95% confidence intervals for the true mean treatment effects, regarding percentage of time with pH > 4 during 24 hours. | | | | |
| --- | --- | --- | --- | --- |
| Treatment | | Estimate | Lower | Upper |
| Omeprazole | 20 mg | 43.7 | 36.7 | 50.7 |
| (−)ome | 20 mg | 53.0 | 46.0 | 60.0 |
| (−)ome | 40 mg | 69.8 | 62.8 | 76.8 |

The data of Table 2 shown below demonstrate that the AUC of (−)omeprazole is significantly higher than that of racemic omeprazole at the 20 mg dose, and the 40 mg dose of (−)omeprazole produced a significantly higher AUC than the 20 mg dose of (−)-omeprazole (p<0.0001).

The interindividual variation in AUC and thus the inhibitory effect is less pronounced following administration of (−)-omeprazole than following administration of omeprazole racemate. This was judged by the coefficient of variation for the mean AUC which was 59% for 20 mg of the magnesium salt of (−)-omeprazole and 88% for 20 mg of omeprazole racemate (p<0.0001).

TABLE 2

| Least square estimates and 95% confidence intervals for the true mean treatment effects, regarding AUC ($\mu$mol × h/L). | | | | |
| --- | --- | --- | --- | --- |
| Treatment | | Estimate | Lower | Upper |
| Omeprazole | 20 mg | 2.3 | 1.8 | 3.0 |
| (−)ome | 20 mg | 4.2 | 3.3 | 5.4 |
| (−)ome | 40 mg | 12.6 | 9.9 | 16.2 |

As a consequence of the less pronounced difference in AUC between slow and rapid metabolizers, the interindividual variation in AUC of (−)-omeprazole is less than that of omeprazole. Furthermore, available data indicate that the interindividual variation in AUC of (−)omeprazole within the group of rapid metabolizers also is less than that observed for omeprazole racemate. These characteristics taken together may potentially result in a larger fraction of patients attaining plasma concentrations which would be optimal with respect to the desired gastric acid anti-secretory effect in the clinical situation.

It was observed that the steady-state AUC of (−)-omeprazole in an average population was significantly higher (2-fold) than that of omeprazole racemate when each compound was given repeatedly in 20 mg daily doses. Therefore, the anti-secretory effect, which is directly correlated to the AUC irrespective of compound, was higher for (−)-omeprazole than for omeprazole racemate following administration of identical doses. This is expected to give a clinical advantage for (−)-omeprazole, since the number of patients healed from the acid-related disease is expected to be higher, and healing is also expected to be achieved within

5,877,192

## 7

a shorter time frame. It might also be expected that a more rapid symptom relief will be obtained.

The clinical studies outlined above demonstrate that the alkali metal salts of (−)-omeprazole have unexpected pharmacokinetic advantages over the omeprazole racemate, such as less interindividual variation in plasma levels (AUC) both between rapid and slow metabolizers and within the group of rapid metabolizers. The alkali metal salts of (−)-omeprazole provide for a larger fraction of patients with optimal plasma concentrations with respect to desired anti-secretory effect. Higher average AUC results in a more pronounced inhibitory effect on gastric-acid secretion and is expected to result in a better overall clinical effect. Thus, the alkaline salts of (−)-omeprazole can provide an improved, alternative pharmaceutical formulation and method for the treatment of gastric acid-related diseases.

What is claimed is:

1. A method for treatment of gastric acid related diseases by inhibition of gastric acid secretion comprising administering to a mammal in need of treatment a therapeutically effective amount of a proton pump inhibitor consisting essentially of the (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole or a pharmaceutically acceptable salt thereof, so as to effect decreased interindividual variation in plasma levels (AUC) during treatment of gastric acid related diseases.

2. A method for treatment of gastric acid related diseases by inhibition of gastric acid secretion comprising administering to a mammal in need of treatment a therapeutically effective amount of a proton pump inhibitor consisting essentially of the (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5-dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole or a pharmaceutically acceptable salt thereof, so as to effect an increased average plasma levels (AUC) per dosage unit.

3. The method according to claim 1 or 2 so as to effect a less pronounced increase in gastrin levels in slow metabolisers during treatment of gastric acid related diseases.

4. The method according to claim 1 or 2 so as to effect a decreased CYP1A induction in slow metabolisers during treatment of gastric acid related diseases.

5. The method according to claim 1 or 2 so as to elicit an improved antisecretory effect during the treatment of gastric acid related diseases.

6. The method according to claim 1 or 2 so as to elicit an improved clinical effect comprising accelerated rate of healing and accelerated rate of symptom relief during the treatment of gastric related diseases.

7. The method according to claim 1 or 2, wherein the (−)-enantiomer of omeprazole or a pharmaceutically acceptable salt thereof, is administered orally in the form of a tablet or a capsule.

8. The method according to claim 1 or 2, wherein the (−)-enantiomer of omeprazole or a pharmaceutically acceptable salt thereof, is administered parenterally.

## 8

9. The method according to claim 1 or 2, wherein the (−)-enantiomer of omeprazole or a pharmaceutically acceptable salt thereof, is administered by intravenous infusion.

10. The method according to claim 1 or 2, wherein the amount administered is about 5–80 mg total daily dose.

11. The method according to claim 1 or 2, wherein the amount administered is about 20–60 mg total daily dose.

12. A method for the production of a medicament for treating gastric acid related diseases, which comprises: combining a therapeutically effective amount of a proton pump inhibitor consisting essentially of the (−)-enantiomer of 5-methoxy-2-[[(4-methoxy-3,5dimethyl-2-pyridinyl)methyl]sulfinyl]-1H-benzimidazole or a pharmaceutically acceptable salt thereof, with a pharmaceutically acceptable carrier.

13. The method according to claim 12, wherein the medicament causes a decreased interindividual variation in plasma levels (AUC) per unit dosage during the treatment of gastric acid related diseases.

14. The method according to claim 12, wherein the medicament causes an increased average plasma level (AUC) per unit dosage during the treatment of gastric acid related diseases.

15. The method according to claim 12, wherein the medicament causes a less pronounced increase in gastrin levels in slow metabolisers during treatment of gastric acid related diseases.

16. The method according to claim 12, wherein the medicament causes a decreased CYP1A induction in slow metabolisers during treatment of gastric acid related diseases.

17. The method according to claim 12, wherein the medicament causes an improved antisecretory effect during the treatment of gastric acid related diseases.

18. The method according to claim 12, wherein the medicament causes an improved clinical effect comprising accelerated rate of healing and accelerated rate of symptom relief during the treatment of gastric related diseases.

19. The method according to claim 12, wherein the medicament produced for oral administration is in the form of a tablet or capsule.

20. The method according to claim 12, wherein the medicament is administered parentally, by intravenous infusion.

21. The method according to any of claims 12–20, wherein the medicament is administered in the amount of about 5 mg to 80 mg total daily dose.

22. The method according to any of claims 12–20, wherein the medicament is administered in the amount of about 20 mg to 60 mg total daily dose.

23. The method according to claim 1 or 2 wherein the (−)-enantiomer of the proton pump inhibitor is essentially devoid of its (+)-enantiomeric contaminant.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRRECTION

**PATENT NO.** : 5,877,192

**DATED** : March 2, 1999

**INVENTOR(S)** : Per Lindberg, et al.

Page 1 of 4

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page insert the following under item [56]:

### U. S. PATENT DOCUMENTS

| EXAMINER INITIAL | | PATENT NUMBER | | | | | | | ISSUE DATE | PATENTEE | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 4 | 6 | 3 | 6 | 4 | 9 | 9 | 1/13/96 | Brandstrom et al | | | |
| | | 5 | 0 | 4 | 5 | 3 | 2 | 1 | 9/3/91 | Makino et al | | | |
| | | 4 | 7 | 3 | 8 | 9 | 7 | 4 | 4/19/88 | Brandstrom et al | | | |
| | | 4 | 8 | 5 | 3 | 2 | 3 | 0 | 8/1/89 | Lovgren et al | | | |
| | | 4 | 7 | 8 | 6 | 5 | 0 | 5 | 11/22/88 | Lovgren et al | | | |

### FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | | | | | | | PUBLICATION DATE | COUNTRY OR PATENT OFFICE | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 4 | 0 | 3 | 5 | 4 | 5 | 5 | 11/90 | DE | | | | |
| | | 0 | 1 | 2 | 4 | 4 | 9 | 5 | 1/14/87 | EP | | | | |

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRRECTION

**PATENT NO.** : 5,877,192    Page 2 of 4
**DATED** : March 2, 1999
**INVENTOR(S)** : Per Lindberg, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | | | | | | PUBLICATION DATE | COUNTRY OR PATENT OFFICE | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9 | 6 | 0 | 1 | 6 | 2 | 3 | 1/25/96 | WIPO | | | | |
| | 0 | 0 | 0 | 5 | 1 | 2 | 9 | 4/29/81 | EP | | | | |
| | 0 | 3 | 6 | 5 | 9 | 4 | 7 | 5/2/90 | EP | | | | |
| | 9 | 5 | 0 | 1 | 7 | 8 | 3 | 1/19/95 | WIPO | | | | |
| | 9 | 2 | 2 | 2 | 2 | 8 | 4 | 12/23/92 | WIPO | | | | |
| | 9 | 6 | 0 | 2 | 5 | 3 | 5 | 2/1/96 | WIPO | | | | |
| | 9 | 4 | 2 | 7 | 9 | 8 | 8 | 12/8/94 | WIPO | | | | |
| | 6 | 2 | 4 | 7 | 9 | 8 | 3 | 4/16/87 | EP | | | | |

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRRECTION

**PATENT NO.** : 5,877,192

**DATED** : March 2, 1999

Page 3 of 4

**INVENTOR(S)** : Per Lindberg, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

### OTHER DOCUMENTS

|  |  |  |
|---|---|---|
|  |  | Cairns, et al. "Enantioselective HPLC determination..." Journal of Chromatography 8,666 (1995) 323-328 |
|  |  | Yamada et al. "Synthesis and isomerization of optical active.." Chem. Pharm. Bull. 42(8) (1994) 1679-1681 |
|  |  | K. Miwa et al. "Jpn. Pharmacol. Ther. "Proton pump inhibitor in rats, mice and dogs" 18 (1990) 165-187 (transl.) |
|  |  | H. Katsuki et al. "Determination of R(+)- and S(-)-Lansoprazole" Pharmaceutical Research 13(4) (1996) 611-615 |
|  |  | M. Tanaka et al. "Direct determination of pantoprazole enantiomers..." Anal. Chem. 68 (1996) 1513-1516 |
|  |  | Erlandson et al. "Resolution of the enantiomers of omeprazole..." J. Chromatography (1990) 532: 305-319 |
|  |  | Chang et al. 1995 "Interphenotype differences..." Brit. J. Clinical Pharmacology 39: 511-518 |
|  |  |  |

## UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRRECTION

**PATENT NO.** : 5,877,192          Page 4 of 4
**DATED**       : March 2, 1999
**INVENTOR(S)** : Per Lindberg, et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

### OTHER DOCUMENTS

| | |
|---|---|
| | A. Brandstrom "Chemical reactions..." Reprint from ACTA CHEMICA SCANDINAVICA" |
| | 43 (1989) 536-611 |
| | K. Sigrist-Nelson et al. "Ro 18-5364, a potent inhibitor of the gastric (H + K) -ATPase" |
| | Eur. J. Bioch. 166 (1987) 453 |
| | Palomo Coll, Alberto (1992) "Preparation of alkali metal salts of omeprazole..." CA |
| | No. 117: 90292 |
| | Rost et al. (1994) "Accelerated caffeine metabolism after omeprazole..." |
| | 55: 402-411 |
| | Rost et al. (1992) " Increase of cytochrane P450IA2 activity..." |
| | 52: 170-180 |
| | Marle et al. "Determination of binding affinity of enantiomers..." J. Chromatography |
| | (1988) 456: 323-336 |

Signed and Sealed this

Twenty-seventh Day of April, 1999

*Attest:*

Q. TODD DICKINSON

*Attesting Officer*          *Acting Commissioner of Patents and Trademarks*

**A46**

## CERTIFICATE OF SERVICE AND FILING – UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

I hereby certify that on September 3, 2013, the foregoing brief was electronically filed with the U.S. Court of Appeals for the Federal Circuit by means of the CM/ECF system. I further certify that pursuant to Federal Circuit Rule 31(b), two true and correct copies of the foregoing were served on the following counsel of record by electronic mail:

Mark Boland
Michael R. Dzwonczyk
Renita S. Rathinam
SUGHRUE MION, PLLC
2100 Pennsylvania Ave., NW
Washington, DC 20037-3213
(202) 293-7060
mboland@sughrue.com
mdzwoncyzk@sughrue.com
rrathinam@sughrue.com

Blair M. Jacobs
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8199
bjacobs@mwe.com

*Counsel for Defendants-Appellees, Hanmi, Inc., Hanmi Pharmaceutical Co., Ltd., and Hanmi Fine Chemical Co., Ltd. and Hanmi Holdings Col, Ltd*

Dated: September 3, 2013                    */s/ Jay I. Alexander*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and contains 8,143 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) and has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied on the word count feature of this word processing system in preparing this certificate.

Dated: September 3, 2013                  */s/ Jay I. Alexander*